Nancy E. CONNORS, Plaintiff,

v.

Richard MILLS, Commissioner of Education; New York State Board of Regents, Defendants.

No. 97–CV–0146.

United States District Court, N.D. New York.

Sept. 24, 1998.

ed assault.

Nancy E. Connors, New Paltz, NY, pro se.

Dennis C. Vacco, Attorney General of the State of New York, Office of Attorney General, Albany, NY, Robert A. Siegfried, AAG, of counsel, Kathleen Surgalla, New York State Education Dept., Albany, NY, for defendants.

### MEMORANDUM—DECISION AND ORDER

KAHN, District Judge.

## I. Introduction

Plaintiff Nancy E. Connors ("Plaintiff" or "Mrs. Connors"), pro se, brings this action on behalf of her learning disabled child, D.C., under the Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. § 1400, et seq. (1988) (current version at 20 U.S.C.A. § 1400, et seq. (West Supp. 1998)), seeking reimbursement for costs incurred pursuing administrative relief and prospective relief relative to D.C.'s continued placement in a non-approved private school. Defendants Richard Mills, Commissioner of Education for the State of New York, and the New York State Board of Regents, move for summary judgment on two grounds. First, Defendants contend that this Court does not have subject matter jurisdiction over the instant action because Plaintiff has failed to exhaust administrative remedies; and, second, that Plaintiff has not stated a valid claim because prospective payment for non-approved private schools is not available under the IDEA. Because the parties concede there are no material issues of fact left to be resolved, this case is ripe for summary adjudication.

## II. Statutory Background [1]

The IDEA is "an ambitious federal effort" to "assist state[s] ... in educating [disabled] children." *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). To qualify for federal funds under the IDEA, a state must implement a plan which "assure[s] that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs...." 20 U.S.C.A. § 1400(c) (West Supp.1998). A "free and appropriate education" is one that is tailored to the unique needs of a particular child such that the child "benefit[s] educationally from [the] instruction." *Rowley*, 458 U.S. at 203, 102 S.Ct. 3034.[2] Local education agencies ("LEA") ensure tailored educational services by generating an individualized education

---

1. The following is a review of the statutory framework of the IDEA as it existed during the time of the events giving rise to this lawsuit. Congress recently amended the IDEA, Pub.L. No. 105–17, 111 Stat. 37 (1997), but these amendments did not take effect until July 1, 1998, long after the time period relevant to the facts described herein.

2. More specifically, § 1401(a)(18) provides that a "free appropriate public education" means special education and related services that—

(A) have been provided at public expense, under public supervision and direction, and without charge,

(B) meet the standards of the State educational agency,

(C) include an appropriate preschool, elementary, or secondary school education in the State involved, and

(D) are provided in conformity with the individualized education program....

20 U.S.C. § 1401(a)(18) (1988).

program ("IEP") for each child in need of special education. 20 U.S.C. § 1414(a)(5) (1988 and Supp.1998). An IEP, prepared at a meeting between the child's teacher, a school representative qualified in special education, and the child's parents, is a written statement that includes the child's present educational performance, lists annual goals and short-term instructional objectives, and describes the specific educational services that the child will receive to achieve those goals. 20 U.S.C.A. § 1401(a)(20) (West Supp.1998).

Congress included a panoply of procedural safeguards to give parents an opportunity to have "meaningful" input in decisions about their child's education. *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); *see* 20 U.S.C.A. § 1415(a) (West Supp.1998) ("Any ... educational agency ... which receives assistance ... shall establish ... procedures ... to assure that children with disabilities and their parents ... are guaranteed procedural safeguards with respect to the provision of free appropriate public education...."). Through these procedures, parents can, for example, present a complaint regarding "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate education to such child." 20 U.S.C. § 1415(b)(1)(E) (1988). If parents choose, their objections and concerns may be heard at an "impartial due process hearing." 20 U.S.C. § 1415(b)(2) (1988). The IDEA gives States the freedom to design a one or a two-tier review process. Under a one-tier system, the impartial due process hearing is conducted by the State education agency ("SEA") and an aggrieved party can seek review in state or federal court. Under a two-tier system, which is used in New York, the initial impartial due process hearing is conducted by the LEA. If the parents are not satisfied with the result of the LEA's due process hearing, they may appeal that result to the SEA, 20 U.S.C. 1415(c) (1988); in New York, the officer who performs this review function is called a state review officer ("SRO"). N.Y.Educ.Law § 4404(2) (McKinney 1995). As in the one-tier system, parents who are dissatisfied with the decision of the SRO can thereafter file suit in either state or federal court. 20 U.S.C. § 1415(e)(2) (1988); N.Y.Educ.Law § 4404(3) (McKinney 1995).

As an alternative to the impartial due process hearing, a parent may file a complaint with the SEA claiming that the school has violated or is violating the IDEA. 34 C.F.R. §§ 300.600–300.662. The SEA then has sixty (60) days to investigate and resolve the matter. 34 C.F.R. § 300.661. If a parent invokes both the due process and the complaint resolution procedures, the SEA will stay its investigation of the complaint pending resolution of the same matters in the due process hearing.

While the IDEA compels states to promulgate a plan that meets certain requirements including guaranteeing the right to a "free appropriate education," Congress left it to the states to implement the specifics of their respective educational programs. In New York, Article 89 of the New York Education Law, § 4401, et seq. (McKinney's 1995 and Supp.1998), was adopted, at least in part, to comply with the IDEA. Under Article 89, it is the charge of a Committee on Special Education ("CSE"), whose members are appointed by the board of education or trustees of each school district, to develop a student's IEP. N.Y.Educ.Law § 4402(1)(b)(1) (McKinney Supp.1998). As noted, New York provides two levels of review for parents objecting to their child's IEP: the parent may request a due process hearing before an impartial hearing officer ("IHO") and, if still aggrieved, the parent may seek review of the IHO's decision before a SRO. N.Y.Educ.Law §§ 4404(1), (2) (McKinney 1995 and Supp. 1998). After the SRO renders a decision, either party may file suit in state or federal court. N.Y.Educ.Law § 4404(3) (McKinney 1995).

Though the IDEA favors placing students in the least restrictive environment which often is the student's public school, *see* 20 U.S.C.A. § 1412(5) (West Supp.1998), if that public school placement is inappropriate, a student may be placed in a more restrictive setting. The SEA is charged with the responsibility of ensuring that children with disabilities are placed in "educational pro-

grams ... [that] meet the education standards of the state education agency." 20 U.S.C.A. § 1412(6) (West Supp.1998). The New York State Education Department ("NYSED") has provided a list of schools that have met the criteria set forth by state and federal law. *See* N.Y.Comp.Codes R. & Regs. title 8, § 200.1(d) (1998) ("Approved private school means a private school which conforms with the requirements of Federal and State laws and regulations governing the education of students with disabilities, and which has been approved by the commissioner for the purpose of contracting with public schools for the instruction of students with disabilities."). If the CSE is unable to find an appropriate placement in the public school, it may place the child in an approved school from NYSED's list. The primary issue presented here is whether the school district, either through the CSE, LEA, or SEA, may place a child in a non-approved private school.

III. Facts

D.C., a child with multiple disabilities, was a student in the New Paltz Central School District ("New Paltz") which is not a party to this action. In September, 1994, after Plaintiff objected to D.C.'s 1994–1995 IEP, she enrolled D.C. at the Brendon Montessori School, a "non-approved" private school. After Plaintiff filed for a due process hearing on February 10, 1995, she hired Marilyn Arons to help her prepare for the hearing and to represent her at a May 18, 1995 settlement conference. The May 18, 1995 settlement provided, *inter alia*, that (1) New Paltz would reimburse Mrs. Connors for placement at the Montessori School for the 1994–1995 school year; (2) New Paltz would provide transportation to the Montessori School until the end of the 1994–1995 term; and (3) D.C. would be given an independent evaluation for speech.

Significantly, New Paltz and Mrs. Connors agreed and, from the record, continue to agree that New Paltz could not provide an appropriate education for D.C. and, moreover, that the Montessori School could so provide.

Unhappy with her son's 1995–1996 IEP and the manner in which New Paltz acted following the May 18, 1995 settlement, Plaintiff filed a complaint with NYSED in September, 1995, claiming that New Paltz was violating the IDEA. NYSED responded to the complaint by indicating that it would investigate and resolve the matter within sixty (60) days as required by statute. In October, 1995, at the beginning stages of the investigation, NYSED learned that Plaintiff had requested a due process hearing regarding the same matters presented in the complaint. Accordingly, NYSED suspended its investigation pending resolution of the administrative proceedings. The due process hearing was held on March 13, 1996 and Mrs. Connors and New Paltz again entered a settlement in which the parties agreed in part that (1) New Paltz would reimburse Mrs. Connors for costs associated with D.C.'s placement at Montessori during the period including July, 1995 to June, 1996, (2) a bank of specified compensatory services would be created as well as the conditions for implementing same, and (3) the CSE would generate an IEP for the 1996–1997 school year and, if the parties could not agree thereto, then a due process hearing would be held.

New Paltz and Mrs. Connors could not agree as to whether Montessori could or should be identified as the official pendency placement on D.C.'s IEP. New Paltz contended that federal law prohibited a public school district from placing D.C. in a non-approved program. Consequently, on June 11, 1996, the parties agreed to "continue to have D.C.'s education provided at the ... Montessori School ... and the district shall pay for the tuition costs of such education ... until the Impartial Hearing Officer renders his decision...." Since June 11, 1996, New Paltz has complied with the terms of the agreement and has paid prospectively for D.C.'s placement at Montessori. Arons represented Plaintiff during the relevant time period and for all settlement agreements relative to the due process hearings.

At the heart of the present controversy is Plaintiff's challenge to New York State procedure which compels Plaintiff to front the costs of unilateral placement in a non-ap-

proved private school and thereafter to request due process review in order to obtain reimbursement for same. Plaintiff asseverates that because she and New Paltz agree that New Paltz cannot provide D.C. an appropriate education and that Montessori can, she should not be required to incur the costs of a due process hearing in order to secure reimbursement. Rather, Plaintiff argues that New Paltz should provide payment without requiring a due process hearing. This raises two concerns beyond the jurisdictional matters Defendant identifies: first, whether prospective payment for placement in a non-approved school is permissible under the IDEA; and, second, whether fees for the services of a non-attorney advocate are covered by the IDEA. Before reaching these issues, however, Defendants' contention that this Court lacks subject matter jurisdiction must be addressed.

## IV. Discussion

### A. Exhaustion

Defendants argue that this Court lacks subject matter jurisdiction because Mrs. Connors failed to exhaust all available administrative remedies. Specifically, Defendants assert that they did not have a chance to address Plaintiff's arguments in an administrative setting because Plaintiff did not raise the issue of prospective payment at any of the impartial due process hearings.

■ Congress included an exhaustion requirement in the IDEA by specifying the following:

> Nothing in this chapter shall be construed to restrict or limit the rights ... of children and youth with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C.A. § 1415(f) (West Supp.1998). Defendants are correct that under the usual circumstances a court cannot entertain a suit when a plaintiff fails to avail herself of all state administrative remedies. *See Stellato*

*v. Board of Educ. of Ellenville Cent. Sch. Dist.*, 842 F.Supp. 1512, 1515 (N.D.N.Y.1994). However, this rule is not without exception. *See Honig v. Doe*, 484 U.S. 305, 326–27, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (stating exhaustion not required when following the administrative process would be futile or inadequate). In particular, courts do not typically require exhaustion when doing so would not serve the doctrine's two purposes of (1) allowing an agency with expertise in the relevant area to develop a record and sharpen the issues and (2) permitting a state or local education agency to identify any errors and to correct them without the need for judicial intervention. *McKart v. United States*, 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) (interpreting Selective Service Act of 1948).

Following *Honig* and *McKart*, the Second Circuit

> has adopted a 'flexible approach' to the exhaustion requirement, excusing a parent's failure to exhaust administrative remedies if resort to the administrative process is futile, the agency has adopted a policy or practice of general applicability that is contrary to law, or it is improbable that adequate relief is available in the administrative forum.

*Mason v. Schenectady City Sch. Dist.*, 879 F.Supp. 215, 218 (N.D.N.Y.1993) (citing *Mrs. W. v. Tirozzi*, 832 F.2d 748, 756 (2d Cir.1987); *Quackenbush v. Johnson City Sch. Dist.*, 716 F.2d 141, 147–48 (2d Cir.1983)); *see also* H.R.Rep. No. 296, 99th Cong., 1st Sess. 4 (1985) (listing same exceptions to exhaustion rule). Arising from the futility exception is the notion that a plaintiff does not have to traverse all avenues of administrative recourse if only legal questions are presented to the court. *See Mrs. W., supra* at 759 (citing *General Elec. Co. v. MV Nedlloyd*, 817 F.2d 1022, 1026, 1027–28 (2d Cir.1987)); *accord Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1305 (9th Cir.1992).

■ In the case sub judice, compelling exhaustion would not serve either of the two exhaustion policies because only legal questions are presented here and neither the hearing officer nor a SRO could grant adequate relief. Mrs. Connors objects to a poli-

cy which prohibits prospective payment for non-approved private schools and she also seeks reimbursement for costs associated with hiring a non-attorney representative. Phrased as interrogatories, the issues are the following: First, can a local or state education agency place a disabled child in a non-approved private school without violating the IDEA? Second, can a court award fees under the IDEA to a non-attorney advocate? Answering these questions will require an analysis of the IDEA and of federal case law, the former requiring an analysis of Supreme Court precedent as well. Neither a detailed examination of a factual record nor an independent factual investigation relative to the appropriateness of D.C.'s educational program is necessary. The ultimate issues, therefore, are purely legal in nature and do not require the expertise or experience of an administrative agency.[3]

Defendants assert that prospective placement in a non-approved school is not allowed under the IDEA or Supreme Court precedent. Clearly then, Mrs. Connors could not get adequate relief if forced to go through the State administrative process. Furthermore, Defendants' steadfast refusal to provide for prospective placement jeopardizes Plaintiff's current arrangement with New Paltz wherein New Paltz has paid prospectively for D.C.'s placement at Montessori since June 11, 1996 pursuant to their settlement agreement.

Defendants argue, in the alternative, that Plaintiff has failed to exhaust available administrative procedures because *New Paltz* failed to avail itself of either the Emergency Interim Placement ("EIP") program[4] or the procedures set forth in New York's administrative code which allow reimbursement to a public school for placement in an approved in-state or out-of-state private school if the public school provides documentation of its efforts to place the student in a public facili-

ty. N.Y.Comp.Codes R. & Regs. title 8, § 200.6(i) (1998). This argument must be rejected for two primary reasons. First, New Paltz is not a party to this action. Defendants have presented no authority for the proposition that a parent must wait for a school district to avail itself of all possible administrative remedies when the school district has chosen not to do so before that parent is able to bring suit in state or federal court. *See Antkowiak by Antkowiak v. Ambach*, 838 F.2d 635, 641 (2d Cir.1988) (finding that where school board chose not to appeal decision favorable to parent, " 'it became the final administrative decision of the [s]tate' ") (quoting *Robinson v. Pinderhughes*, 810 F.2d 1270, 1272 (4th Cir.1987)). Second, relative to the standard administrative procedures, New Paltz was not required to appeal under the IDEA because it was not "aggrieved" by any of the settlements. Thus, the fact that New Paltz did not avail itself of either of the specified processes is of no moment here. Accordingly, Plaintiff's failure to exhaust is excused.

Defendant Mills also argues that he would not be a proper party to a lawsuit even if Plaintiff did exhaust her administrative remedies. Defendants cites *M.M. v. Board of Educ. of Waterville Cent. Sch. Dist.*, 963 F.Supp. 185 (N.D.N.Y.1997) to support this contention. *M.M.*, however, involved justiciability concerns not present here. In that case, the court held that Article III justiciability requirements were lacking due to the fact that (1) plaintiffs did not establish a causal nexus between their injury and defendant's actions because the SRO rendered a decision independent of the Department of Education's policy and (2) plaintiffs could not secure redress for their alleged injury because they failed to establish the appropriateness of their desired placement. *Id.* at 189–90.

---

**3.** *See, e.g.*, Pl.'s Mem., Ex. H, Letter from Garrett Silveira to Marilyn Arons of December 13, 1995 (stating that whether including Montessori on D.C.'s IEP is appropriate or not "is a pure legal issue for which no testimony is necessary.").

**4.** NYSED's EIP program is used when a student's educational needs cannot be met by in-

state or out-of-state day/residential programs that are approved by NYSED. Rothfuss Aff., Ex. J. In that case, the school district works with the Residential Placement System to place the student at a school in another state that has been approved for residential placement by the host state. *Id.*

Beyond the speculative and counterfactual nature of Defendant's argument, it should be noted that here the New Paltz Board of Education was not willing to grant Plaintiff's request for relief because it felt that to do so would not comport with state and federal law. Pl.'s Mem. at ¶ 11. It is clear that Commissioner Mills also interprets federal law to prohibit Plaintiff's requested relief and that he would enforce that policy. As a result, there is a nexus between the law or policy as interpreted and the denial of Plaintiff's relief. Further, unlike in *M.M.*, the appropriateness of the private placement and the inappropriateness of the public placement are not at issue here. Therefore, Plaintiff may properly maintain this action against Defendant Mills.[5]

## B. Prospective Relief

According to Defendants, Plaintiff cannot state a valid claim notwithstanding a finding of jurisdiction because the IDEA and Supreme Court precedent demonstrates that prospective relief for placement in non-approved private schools is unavailable under the IDEA. While Defendants' citations to *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) and *School Comm. of Burlington v. Department of Educ. of Mass.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) are not entirely misplaced, they do not dispose of Plaintiff's case. To the contrary, they establish the validity of Plaintiff's argument.

■ Neither *Carter* nor *Burlington* address the issue presented here. In *Carter*, the Supreme Court held that a court may order reimbursement for parents who unilaterally place their child in a non-approved private school if it is determined that "the public placement violated IDEA and that the private school placement was proper under the Act." *Id.* at 15, 114 S.Ct. 361 (hereafter the "*Burlington* prerequisites"). Stated otherwise, once a parent shows the *Burlington*

prerequisites, the parent has a right to be reimbursed for the cost of the private placement, whether or not that placement is in an approved school. Though Defendants correctly point out that both *Carter* and *Burlington* stated that parents who unilaterally place their child in a private school " 'do so at their own financial risk' ", *Carter*, 510 U.S. at 15, 114 S.Ct. 361 (quoting *Burlington*, 471 U.S. at 373–74, 105 S.Ct. 1996), Defendants incorrectly imply from this that reimbursement is the only remedy available to Plaintiff. The Supreme Court made this statement in the context of cases where the *Burlington* prerequisites had not yet been satisfied. In the case sub judice, however, Plaintiff has shown the *Burlington* prerequisites. Plaintiff's right to payment for placing D.C. in the Montessori school has attached and, as a result, she incurs no financial risk for such placement. The only issue is whether she can require New Paltz to pay the tuition directly or if she must front the tuition costs and then obtain reimbursement.

Defendants contend that compelling prospective or immediate payment in all situations where the *Burlington* prerequisites are met would require LEAs to violate §§ 1401(a)(18)(B) (current version at 20 U.S.C.A. 1412(a)(10)(B)(ii) (West Supp.1998)) and 1413(4)(B)(ii) of the IDEA. Section 1401(a)(18)(B) provides in pertinent part that a "free appropriate education" is education and related services that "meet the standards of the State educational agency." Further, pursuant to § 1413(4)(B)(ii), a SEA must ensure that private schools in which the SEA or LEA place a child "meet standards that apply to State and local educational agencies." *See also* N.Y.Educ.Law § 4402(2)(b)(2) (McKinney 1995) Stated otherwise, in order for a SEA or a LEA to comply with the Act, the private school in which either agency places a child must be approved.

---

5. As a practical matter, if Plaintiff succeeds in the case at bar, it will be Defendant's responsibility to effect the necessary change. Defendant is responsible for approving all contracts for educational services that public schools enter with private schools. N.Y.Educ.Law § 4402(2)(b)(2) (McKinney 1995). At the moment, no contract for private placement will be approved "unless

... (ii) such placement will be in a private school approved by the commissioner for the education of students with disabilities". N.Y.Comp.Codes R. & Regs. title 8, § 200.6(i)(2). Plaintiff, in part, seeks a change in the application of this policy. In short, bringing suit against an individual other than Defendant would be ineffectual.

The statutory text, however, is not as transparent as Defendants contend. Whether the educational services offered a child "meet the standards of the State educational agency" is only one aspect of a "free appropriate public education." Section 1401(a)(18) also provides that a "free appropriate public education" includes "an appropriate ... education", § 1401(a)(18)(C), that is "in conformity with the [IEP]." § 1401(a)(18)(D). From the text, it is apparent that Congress intended "free appropriate public education" to include both procedural and substantive aspects. Defendants interpret the Act in such a way as to assign greater importance to the procedural aspects of "free appropriate public education" than to the substantive aspects.

■ Because Defendants are responsible for administering the implementation of the IDEA in New York, their interpretation thereof is entitled to deference. *N.L.R.B. v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). Courts, however, "are the final authorities on issues of statutory construction." *Federal Election Commission v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981). As such, courts "must reject administrative constructions of the statute, whether reached by adjudication or by rule-making, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Id.* (citing *SEC v. Sloan*, 436 U.S. 103, 118, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978); *FMC v. Seatrain Lines, Inc.*, 411 U.S. 726, 745–46, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973); *Volkswagenwerk v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968); *N.L.R.B. v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965)). Consequently, Defendants' construction will not be found controlling if it would frustrate or is inconsistent with the purpose of the IDEA.

" 'Statutes ... are not inert exercises in literary composition[, but] instruments of government,' ... [so] a statute's meaning is inextricably intertwined with its purpose, and [a court must] look to statutory text to determine purpose...." *Rowland v. California Men's Colony*, 506 U.S. 194, 211 n. 12, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993) (citing

*United States v. Shirey*, 359 U.S. 255, 260, 79 S.Ct. 746, 3 L.Ed.2d 789 (1959)). Section 1400(c) provides that the purpose of the Act was to "assure that *all* children with disabilities have ... a free appropriate public education...." 20 U.S.C.A. § 1400(c) (West Supp.1998) (emphasis added). The Supreme Court has also found that the purpose or policy behind the Act was to ensure that all children have access to a free appropriate public education.

■ In reaching its conclusion, the *Carter* Court noted that the "IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free" 510 U.S. at 13, 114 S.Ct. 361 (citing *Burlington*, 471 U.S. at 373, 105 S.Ct. 1996), the attainment of which should not be precluded because a state had not granted a school its "stamp of approval[.]" *Id.* (citing with approval the lower court's decision in the same case, 950 F.2d 156, 164 (4th Cir. 1991)). In effect, the Court made clear that the substantive aspect of a free and appropriate education is different from the procedural requirements placed on States. *See also Rowley*, 458 U.S. at 206, 102 S.Ct. 3034 (noting distinction between the substantive and procedural aspects of IDEA by finding compliance with prescribed procedures would in most, but not all, cases provide "what Congress wished in the way of substantive content of an [IEP]."). Contrary to Defendants' assertion, the important notion limned from *Carter* is that the substantive guarantee of a free and appropriate education takes primacy over a state's approval procedures when those two statutory provisions conflict. The challenge for this Court then becomes to define the circumstances, if any, in which a child's right to a free and appropriate education conflicts with a state's approval process such that prospective payment is warranted. These circumstances are identified when viewed in light of the concerns permeating *Carter, Burlington,* and the Supreme Court's first case interpreting the IDEA, *Rowley, supra.*

Underlying the Supreme Court's decision in these cases was a concern that the child is given meaningful access to needed educational services such that the intentions of the Act

are respected. Starting with *Rowley*, the Court rejected an interpretation of the Act and of Congressional intent that would require schools to maximize the potential of disabled children "commensurate with the opportunity provided non[disabled] children." 458 U.S. at 200, 102 S.Ct. 3034. Rather, the Court concluded that Congress's intent in enacting the IDEA was to provide "access to a free and public education." *Id.See also id.* at 192, 102 S.Ct. 3034 (access must be "meaningful"); *id.* at 201, 102 S.Ct. 3034 (" '[T]he basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child."). In granting the greatest opportunity for access to educational services, Congress provided for placement in both private and public school settings. *See* 20 U.S.C.A. § 1413(a)(4)(A), (B) (West Supp .1998); 20 U.S.C.A. § 1412(5) (West Supp. 1998) (encouraging "mainstreaming" but permitting removal to private schools). While the IDEA specifically provides for LEAs to privately place a child, no statutory license is required for a parent to do so as well. Instead, a parent may unilaterally place a child in a private school without the consent of the LEA. While a parent's right to do so has been clear, it was not apparent whether the parent was also entitled to reimbursement for the costs of the private placement.

In *Burlington*, the Supreme Court addressed this issue and held that a parent was entitled to reimbursement for unilaterally placing a child in an approved private school if the *Burlington* prerequisites are shown. 471 U.S. at 369, 105 S.Ct. 1996. Consistent with *Rowley*, the Court noted how a parent's financial situation and the inertia of administrative review affected a child's right of access to needed services:

> [T]he review process is ponderous. A final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by that IEP has passed. In the meantime, the parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate place-

ment. If they choose the latter course, which conscientious parents *who have adequate means* and who are reasonably confident of their assessment normally would, it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials.

471 U.S. at 370, 105 S.Ct. 1996 (emphasis added). In a situation where a parent does *not* have the adequate means to finance unilateral private placement and is told by a court years later that they were right, the victory would not only be empty but meaningless.

By prohibiting prospective placement, Defendants would deny assistance to families that are not able to front the cost of a private non-approved school, without exception. Under Defendants' reading of the IDEA, therefore, even in a situation as the one presented here where both the school and the parent agree that the child's unique needs require placement in a private non-approved school and that there are no approved schools that would be appropriate, a destitute child would be left in an inappropriate program because the parents would not be able to front the tuition of private placement. Given the fragile state of many disabled children, and their dire need for constant and consistent care, even brief periods of inappropriate schooling could lead to tremendous educational, social, emotional, and psychological deterioration. Families of greater economic means would not be faced with such a grim prospect. It simply cannot be the case that an act designed to grant "all" disabled children access to needed services would undermine that very goal by making such access dependent upon a family's financial situation.

In a recent case, the Third Circuit has more specifically recognized the relationship between meaningful access and economic means. In *Susquenita Sch. Dist. v. Raelee*, 96 F.3d 78 (3d Cir.1996), parents of a disabled child, Raelee, rejected the school district's IEP and placed the child in a private school. *Id.* at 79. The parents then requested an impartial due process hearing to deter-

mine whether Raelee was properly placed, and, therefore, whether they were entitled to tuition reimbursement. After the hearing officer found the IEP appropriate and, consequently, the school district not liable for Raelee's private placement, the parents appealed the decision to the state special education appeals panel. *Id.* The panel reversed the hearing officer, held that "the program offered by the private school [was] appropriate for Raelee", *id.* (citing Special Education Opinion No. 672, Typescript at 13), and ordered the school to reimburse the parents for the private school tuition. The school district made a similar argument as Defendant presents here that "the Supreme court's decision in *Burlington* mandates that prospective tuition reimbursement or reimbursement 'pendente lite' be barred under the IDEA...." *Id.* at 84. The Third Circuit held that "the concerns underlying [*Burlington*]" supported a finding that "a school district may be required to pay for tuition and expenses associated with a pendent placement prior to the conclusion of litigation." *Id.* Specifically, the choice between leaving a child in a placement that parents feel is inappropriate and paying for a private placement they feel is appropriate is

> real only for parents who have the financial wherewithal to pay for alternative placement. While parents who reject a proposed IEP bear the initial expenses of a unilateral placement, the school district's financial responsibility should begin when there is an administrative or judicial decision vindicating the parent's position. The purpose of the Act, which is to ensure that every child receive a "free and appropriate education" is not advanced by requiring parents, who have succeeded in obtaining a ruling that a proposed IEP is inadequate, to front the funds for continued private education.
>
> The burden that such an approach would place on many families is overwhelming. The cost of private education, especially in institutions specializing in teaching the learning disabled, is substantial. Families without means would be hard pressed to pay for private education in what will al-

most invariably be the significant time lapse between a ruling in their favor and the ultimate close of litigation. "The review process is ponderous." *Burlington,* 471 U.S. at 370, 105 S.Ct. 1996. Without interim financial support, a parent's "choice" to have his child remain in what the state has determined to be an appropriate private school placement amounts to no choice at all. The prospect of reimbursement at the end of the litigation turnpike is of little consolation to a parent who cannot pay the toll at the outset.

*Id.* at 86–87. *See also Komninos v. Upper Saddle River Bd. of Educ.,* 13 F.3d 775, 780 (3d Cir.1994) (recommending district court consider on remand the financial condition of parents as "a matter that might make the reimbursement alternative unrealistic.").

In this case, there was agreement early on between New Paltz and Mrs. Connors that New Paltz could not provide D.C. with an appropriate education and that Montessori could. At that point, the *Burlington* prerequisites were met, and New Paltz was required to pay *notwithstanding Montessori's status as a non-approved school.* Montessori's non-approved status, therefore, is irrelevant to the fact of payment; the only issue is whether it affects the *time* of payment.

Given *Carter, Burlington,* and *Rowley,* a school's non-approval status cannot be the justification for denying a child access to needed educational services in all situations. In particular, when a child's access to a free and appropriate public education in a substantive sense conflicts with the state's approval process, *Carter* instructs that the state's approval process must give way. Such a situation arises when a parent does not have the financial means to front the cost of a non-approved private school. Without external support, the child would have no chance at what has already been determined to be his or her opportunity to receive an appropriate education. As a result, once the *Burlington* prerequisites relative to a non-approved private school are met, and a parent shows that his or her financial circumstances [6] eliminate the opportunity for unilat-

---

6. The determination whether a parent is not financially able to front the cost of private place-

eral placement in the non-approved school, the public school must pay the cost of private placement immediately.[7]

■ Turning to the instant case, Plaintiff has presented no evidence that she is unable to front the tuition for D.C.'s placement at Montessori. While this may ordinarily require remand to the administrative agencies in order to allow them an opportunity to address Plaintiff's financial situation, Plaintiff has not even alleged that she is unable to front the cost of Montessori nor does it appear from the record that she ever complained of her financial situation prior to this litigation. As a result, Plaintiff cannot show a conflict between the state's approval process and D.C.'s substantive right of access to a free and appropriate public education. Accordingly, Plaintiff does not fall within the scope of the financial circumstances exception described above.

Plaintiff also objects to being forced to repeatedly animate the due process machinery and incur the costs thereof in order to secure reimbursement. Provided New Paltz continues to concede that the *Burlington* prerequisites are manifest or same is found by an IHO or a court, there should be no need for Plaintiff to invoke the technical formality of seeking due process review in order to get reimbursement. Her right to payment is established and all that should be required is a payment demand letter.[8] Requiring anything beyond the demand letter would not serve the purpose of IDEA's procedural safeguards and would only further deplete resources that should be allocated to the betterment of disabled children.[9]

### C. Mrs. Arons' Fees

■ The only matter left to be examined is whether Plaintiff may recoup the cost of hiring Mrs. Arons as her representative at the various due process hearings. The IDEA provides that "[in any action or proceeding brought under this subsection, the court, in its discretion, may award reasonable attorney's fees as part of the costs to the parents or guardian ... who is the prevailing party]." 20 U.S.C. § 1415(e)(4)(B) (1988 and Supp.1998). Though not explicit in her memorandum, Mrs. Connors implies that fees for lay advocates fall within the scope of § 1415(e)(4)(B) when that section is read in conjunction with § 1415(d)(1). Section 1415(d)(1) provides that "[a]ny party to any hearing conducted pursuant to subsections (b) and (c) of this section shall be accorded ... the right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the

ment should be made in the first instance by the IHO or SRO; i.e., the parent should exhaust the state administrative procedures before raising the claim in court proceedings. Though the specifics of the calculation are not given here, such evaluations are regularly done in the educational setting relative to determinations of financial aid. Schools should draw from similar experience and expertise in order to fashion an appropriate calculus here.

7. This rule comports with the "broad discretion", *Carter*, 510 U.S. at 16, 114 S.Ct. 361, courts retain in granting "such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2) (1988)(current version at 20 U.S.C.A. § 1415(i)(2)(B)(iii) (West Supp.1998)). Both *Carter* and *Burlington* found the authority to order reimbursement in § 1415(e)(2). The circumstances here do not specifically raise the question of whether an IHO or a SRO could also order prospective relief when circumstances comparable to those presented herein arise. While such a holding is beyond the scope of this decision, it seems beyond cavil that they could so order given that the failure to do so would be contrary to Carter and would deny a child the

right of access to needed services guaranteed by the IDEA.

8. This should not be an issue here because New Paltz did say through Attorney Silveira that it was willing to resolve the matter without "the needless expense of a hearing." Pl.'s Mem., Ex. H, Letter from Garrett L. Silveira to Marilyn Arons of Dec. 13, 1995.

9. In *Antkowiak by Antkowiak v. Ambach*, 838 F.2d 635 (2d Cir.1988), the Second Circuit held, without exception, that a school could not place a student in a non-approved program because doing so would violate federal law. 838 F.2d at 640. Compelling a school to make prospective payment for a non-approved private placement, therefore, seems on the surface to run afoul of that rule. However, *Carter*, decided after *Antkowiak*, instructs us that in those limited circumstances where a child's right of access to the substantive aspect of a free and appropriate education comes into conflict with the approval process, the former must prevail. This decision is consistent with *Carter's* instruction and does not interfere with Antkowiak's holding in the majority of situations.

problems of children with disabilities." 20 U.S.C.A. § 1415(d)(1) (West Supp.1998). Defendants do not contest Plaintiff's assertion that she was a "prevailing party" in the various settlement agreements or that attorney's fees are available for "legal services rendered in connection with impartial hearings", *Shanahan v. Board of Educ. of Jamesville–DeWitt*, 953 F.Supp. 440, 444 (N.D.N.Y. 1997) (citing *Brown v. Griggsville Community Unit Sch. Dist. No. 4*, 12 F.3d 681, 684 (7th Cir.1993)), and for pre-hearing settlements. *Id.* Nor do Defendants challenge the reasonableness of Mrs. Arons's fees. The only issue presented is whether § 1415(e)(4)(B) includes within its scope the fees of a non-attorney advocate.

Defendants cite *Arons v. New Jersey State Bd. of Educ.*, Civ.A. No. 85–209, 1987 WL 10808 (D.N.J. May 12, 1987), *aff'd*, 842 F.2d 58 (1988), to support their assertion that non-attorney advocates are not entitled to fees under § 1415(e)(4)(B). In *Arons*, plaintiff (the same individual who represented Mrs. Connors here) argued that a New Jersey administrative rule prohibiting non-attorney advocates from receiving fees for representation at administrative hearings, *see* N.J.Admin.Code title 1, § 21–1(e), was both preempted by the IDEA and a denial of her right to Equal Protection. From the Act's statutory language and legislative history the court concluded that the IDEA did not preempt the New Jersey rule because IDEA's "permissive language affording parents the right to representation does not create a simultaneous obligation to compensate the advocate." *Arons, supra* 1987 WL 10808 at *4. Citing differences between lay advocates and attorneys relative to their "training, legal experience and professional accountability", *id.* (citing *Peniman v. Cartwright*, 550 F.Supp. 1302 (S.D.Iowa 1982) (denying attorney's fees to "jailhouse lawyer" under 42 U.S.C. § 1988) and *Grooms v. Snyder*, 474 F.Supp. 380 (N.D.Ind.1979) (same)), the court concluded that Congress did not grant courts blanket discretion to compensate non-attorney advocates as well as attorneys. Significantly, the court noted that "nothing in the [IDEA] prevents the state of New Jersey from amending its own regulations to compensate lay advocates." *Id.* 1987

WL 10808 at *5. In essence, therefore, the court made clear that the IDEA itself would not prohibit an award of fees to a lay advocate if a state so chose to provide.

In affirming the district court, the Third Circuit noted that though the text of the IDEA provided for advice or assistance from "individuals with special knowledge or training", *Arons v. New Jersey State Bd. of Educ.*, 842 F.2d 58, 62 (3rd Cir.1988), it did not specifically provide for compensation to a lay advocate in his or her representative capacity. The distinction between representation and mere advice was important to the court. Citing the text and the legislative history of the Act, the court found that "the statute does not use the word 'represent' ... as would be expected if Congress intended to place expert and legal counsel on the same footing." *Id.* at 62.

Similar to the New Jersey Administrative Code and contrary to the IDEA as interpreted by the Third Circuit, the New York Administrative Code provides for lay advocates to "represent" parents at due process hearings. *See* N.Y.Comp.Codes R. & Regs. title 8, § 200.5(c)(5) (1998) ("The parties to the proceeding may be *represented* by legal counsel or individuals with special knowledge or training ... and may be accompanied by other persons of their choice.") (emphasis added). Further, parents as well as their "representative, shall have an opportunity to present evidence and to confront and question all witnesses at the hearings. Each party shall have the right to prohibit the introduction of any evidence the substance of which has not been disclosed to such party at least five days before the hearing." N.Y.Comp.Codes R. & Regs. title 8, § 200.5(c)(9) (1998). The New York Administrative Code, therefore, provides for the performance of legal services by lay advocates.

Using the Third Circuit's logic and ignoring New Jersey's no-fee provision for the moment, it appears that both New York and New Jersey place experts on the "same footing" as legal counsel. New Jersey specifically rejects that implication by denying lay advocates a fee for representative services.

Unlike New Jersey, however, New York does not expressly condition a lay advocate's right to represent a parent on a renunciation of fees for services performed. Although on first blush, then, New York permits the expert-legal counsel equality to stand such is not the case upon closer examination.

The New Jersey Administrative Code includes a mechanism to evaluate the experience and competence of an individual seeking to represent parents at a due process hearing. *See* N.J.Admin.Code title 1, § 1–5.4(3)(iv) (1998) (requiring non-lawyer applicant to submit a written description of "his or her relevant education, work experience or other qualifications related to the child's condition."). In addition, New Jersey provides for the imposition of sanctions on lay advocates if necessary. *See* N.J.Admin.Code title 1, §§ 1–5.5 and 1–14.14 (1998). New York has neither a screening/application procedure nor a method that governs sanctions for inappropriate lay advocate behavior.

In the absence of affirmative state action in promulgating regulations that govern the training and conduct of lay advocates, Plaintiff's request for Ms. Arons's fees pursuant to § 1415(e)(4)(B) must be denied. Through education and experience in dealing with legal issues, attorneys receive rigorous training that lay advocates, in most situations, cannot parallel. While Mrs. Arons has proven herself to be a competent, capable, and effective advocate for parents dealing with IDEA issues, a ruling in her favor would also inure to the benefit of those who are less competent and less scrupulous unless such a ruling was confined in application by appropriate regulations that, for example, set forth specific standards individuals had to meet in order to qualify as IDEA lay advocates. *See Peniman,* 550 F.Supp. 1302 (S.D.Iowa 1982) (denying fees in part because of concern over growth of a "cottage industry") *Grooms,* 474 F.Supp. 380 (N.D.Ind.1979) (same). The design and implementation of such confining measures is the province of a legislature or an administrative agency and not of a court. Indeed, the State has broad powers to enact such procedures. *See Goldfarb v. Virginia State Bar,* 421 U.S. 773, 792, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) ("States have a compelling interest in the practice of professions within their boundaries, and ... have broad power to establish standards for licensing practitioners and regulating the practice of professions."). Accordingly, Plaintiff's request for reimbursement of Mrs. Arons's fees pursuant to § 1415(e)(4)(B) is hereby denied.

That is not to say that Mrs. Arons cannot collect her fees as an educational consultant or as a witness. *See, e.g., Arons,* 842 F.2d at 62. Thus, Mrs. Arons may recoup all fees incurred in producing technical reports, attending the hearings, or in advising Mrs. Connors regarding educational problems, the evaluation thereof, and the proper educational placement for D.C.. In her memorandum, Mrs. Connors includes the following fee schedules:

| 5/5/95 | 1.5 hours | Development of evidence list |
| 5/7/95 | 4.0 hours | Trial preparation |
| 5/12/95 | 6.0 hours | Hearing |
| 5/14/95 | 1.5 hours | Trial preparation |
| 5/18/95 | 1.0 hours | Hearing |

Pl.'s Mem.Ex. D.

| 12/27/95 | 3.0 hours | Silveira to Arons letter |
| 03/13/96 | 2.0 hours | Preparation for hearing |
| 03/03/96 | 3.0 hours | Hearing |
| 06/11/96 | 4.0 hours | Preparation for trial |
| 06/11/96 | 4.0 hours | Hearing negotiations |

Pl.'s Mem.Ex.J. The total for the above services is $3,000. While this list shows activities Mrs. Arons did in a general sense, it does not break down her services sufficiently to differentiate between those pertaining to legal representation and those pertaining to consultation, advice, or any other compensable activity. As a result, a calculation of fees owed cannot be done at this time. If Plaintiff wishes, she may submit an itemized fee schedule provided the schedule was produced contemporaneously with Mrs. Arons's services.

Accordingly, Defendant's motion for summary judgment is hereby GRANTED.

IT IS SO ORDERED.