**LAMOINE SCHOOL COMMITTEE,
Plaintiff,**

v.

**MS Z., on behalf of her minor son N.S., Defendant.**

**No. CV–03–197–B–W.**

United States District Court,
D. Maine.

Jan. 4, 2005.

Eric R. Herlan, Drummond, Woodsum & MacMahon, Portland, ME, for Plaintiff.

James C. Munch, III, Vafiades, Brountas & Kominsky, Bangor, ME, for Defendant.

## ORDER AND MEMORANDUM OF DECISION

WOODCOCK, District Judge.

Plaintiff Lamoine School Committee ("Lamoine") filed this action pursuant to 20 U.S.C. § 1415(i)(2) of the Individuals with Disabilities Education Act ("IDEA" or "the Act")[1] challenging a decision of a Maine Department of Education Hearing Officer ("Hearing Officer"). The Hearing Officer granted Defendant Ms. Z's request for reimbursement in connection with the placement of her son ("N.S.") at the School of Urban Wilderness Survival (SUWS) in North Carolina and the Academy at Cedar Mountain, a private school in Utah. Ms. Z. filed a cross-appeal for attorney fees. This Court AFFIRMS the decision of the Hearing Officer, DENIES the Plaintiff's appeal, and GRANTS the Defendant's request for attorney fees.

## I. BACKGROUND[2]

### A. Underlying Facts

N.S. is currently sixteen years old. (R. at 64). In third grade, he was identified with learning disabilities in reading, writ-ten language, and math and began receiving special education services. (R. at 64, 407–08). In fifth grade, N.S. attended school in Bar Harbor, Maine and continued to receive special education services. (R. at 64, 408–09). During his early education, N.S. progressed academically, but teachers reported concern about his low self-esteem and isolation from classmates. (R. at 64–65, 409). After N.S. refused to engage therapeutically with Peter Rees, a mental health counselor, he was treated by his family physician for sleep and bed wetting problems and was prescribed a mild antidepressant, which had a beneficial effect. (R. at 65, 409–10).

William E. Davis, Ph.D. evaluated N.S. at the beginning of his sixth-grade year (1999) and concluded N.S. "manifested very strong failure-set behavioral patterns," experienced "some fairly substantial feelings of inadequacy, especially regarding his overall cognitive and academic abilities," and "may often know more than his overt performance might suggest but that he likely 'shuts down' when anticipating difficulty—thus avoiding possible embarrassment." (R. at 65, 313). Dr. Davis summarized the results of N.S.'s evaluation as follows: (1) an average to high average range of cognitive functioning; (2) evidence of strong cognitive abilities within both verbal and nonverbal domains, but with major cognitive strengths lying within the nonverbal, visual perceptual domain; (3) evidence of very strong failure-set behavioral patterns; and, (4) evidence of feelings of anxiety and frustration, primarily involving academic performance. (R. at 315–16). Dr. Davis recommended "in-

1. 20 U.S.C. § 1400 *et seq.*

2. The facts are drawn largely from the Hearing Officer's findings to the extent they are supported by a preponderance of the evidence in the record. When necessary, those findings are supplemented with additional record information. The Hearing Officer's decision is contained at pages 63–79 of Part I of the Administrative Record. The Record cites refer to the handwritten number at the top right of each page.

structional supports and whatever instructional modifications are deemed necessary" to help N.S. "gain more confidence in himself and in his abilities," noting N.S. "is a very sensitive young man who may be experiencing more frustration and anxiety than his overt behaviors might suggest." (R. at 65, 316).

N.S. attended Connors–Emerson School in Bar Harbor his seventh-grade year (2000–2001). (R. at 65, 300). Under an Individualized Education Plan ("IEP") dated December 8, 2000 he received resource room services in reading, writing, and math. (R. at 65, 303). The December Pupil Evaluation Team ("PET") minutes document that N.S. "shut[s] down when he doesn't understand something" and "has a difficult time with his learning disabilities and self esteem." (R. at 301). However, the school provided no counseling services, and his mother did not request any at this time. (R. at 413). N.S. expressed an interest in attending boarding school, and the special education teacher provided his mother with a list of schools for children with learning disabilities. (R. at 301).

In the spring of N.S.'s seventh-grade year, he stopped taking his medications, which resulted in a major period of depression. (R. at 65, 411–12). N.S. began "sleeping all the time," withdrawing from his friends, and acting disrespectfully towards his mother. (R. at 65, 412). In August 2001, the summer before N.S.'s eighth-grade year, his mother sought the help of Dr. David Hawkins, a psychiatrist. (R. at 65, 412–13). N.S. refused to meet with Dr. Hawkins without his mother present and never really engaged therapeutically. (R. at 65, 414).

### B. Transfer to Lamoine: 2001–2002

During the early fall of eighth grade (2001–2002), N.S. did not attend school regularly due to depression; in November 2001, he transferred to the Town of Lamoine school system. (R. at 65, 418). Ms. Z asked the Lamoine PET to order a home-based tutorial program, based in part on an assessment by Dr. Hawkins. (R. at 210, 218). In a letter dated November 21, 2001 to the Special Education Director, Laura Sereyko, Dr. Hawkins noted that N.S. "suffers [from] severe depression, which impairs his ability to function academically, and has destroyed his ability to attend school." (R. at 218). He wrote that N.S. "requires intensive supportive one to one attention to progress in learning," which leads "to the obvious need for tutoring in the home." (R. at 218). During a November 30, 2001 Lamoine PET meeting, Ms. Sereyko stated there was "no documentation or evaluation to support emotional issues" and recommended a behavioral/psychological evaluation "to determine if [N.S.] is emotionally disturbed or [if] his behavior/actions are caused as a result of control issues." (R. at 212). Pursuant to a November 30, 2001 IEP, N.S. began receiving in-home tutoring by the Lamoine School District. (R. at 65–66, 195–96).

In January 2002, Bruce Saunders, Ph.D. evaluated N.S. to determine whether his refusal to attend school was disability-based or a result of control issues. (R. at 66, 203–08). Dr. Saunders reviewed PET minutes, prior psycho-educational evaluations, and Dr. Hawkins's November 21, 2001 letter; conducted clinical interviews with N.S. and his mother; and administered the Rorschach Technique and the Millon Adolescent Clinical Inventory ("MACI"). (R. at 66, 203–08). Dr. Saunders found no clinical or psychometric evidence to warrant a diagnosis of depression, but accepted by history the diagnoses of major depression, adjustment disorder with anxiety, and learning disability. (R. at 66, 207–08). In response to N.S.'s de-

sire to attend a preparatory school, Dr. Saunders noted the following:

> [N.S.] would be devastated in a preparatory school. He clearly needs the support of his family .... [N.S.] is highly vulnerable. Forcing him to attend a structured public school program would likely result in his breakdown. I believe that neither Dr. Hawkins nor I could support that move, although he and I did not discuss this case directly. I believe that if we force this child to attend school, we will not be providing a service for him.

(R. at 208). Dr. Saunders recommended continued tutoring as well as individual psychotherapy services with Dr. Hawkins. (R. at 66, 208).

The next PET meeting was held on February 8, 2002 to discuss Dr. Saunders's evaluation. (R. at 190–91). The PET changed the IEP to increase tutorial time with a focus on reading, writing, and math. (R. at 194). Modifications included access to computers for written work, untimed use of the resource room, and a regular discipline program. (R. at 194). At a PET meeting on June 12, 2002 Ms. Z. stated her intention to enroll N.S. at Mt. Desert Island High School ("MDI") in the fall. (R. at 66, 186–87). The PET offered to set up a meeting with the special education staff at MDI and encouraged N.S. to visit the school so that he would feel comfortable when he started. (R. at 66, 187). During the summer of 2002, N.S. worked in his mother's pottery studio and did well there. (R. at 66, 425–26).

## C. MDI High School: Fall 2002

In September 2002, N.S. began attending MDI. (R. at 66, 175). The September 9, 2002 IEP provided that N.S. would receive direct instructional services in English and Social Studies for 25% of the day, have access to a computer for all writing projects, be given editing support, and have the option of taking untimed tests in the resource room (R. at 66, 176, 179). At Ms. Z.'s request, the PET held another meeting on September 23, 2002 to discuss N.S.'s tardiness due to his depression, sleep disorder, and medication. (R. at 66–67, 170–71). The PET recommended against N.S. receiving discipline for his tardiness. (R. at 67, 171). Based on the effect of his medication, Dr. Hawkins supported the plan to accommodate N.S.'s occasional late arrivals. (R. at 67, 168).

In October 2002, the school referred N.S. to a counselor, Jeff McCarthy, L.C.P.C. (R. at 67, 132). Mr. McCarthy met with N.S. eight times, from October 29, 2002 to January 7, 2003, but N.S. was unwilling to engage with Mr. McCarthy or to participate in therapy. (R. at 67, 452–53). By letter dated January 15, 2003, Mr. McCarthy identified N.S. as having "significant emotional difficulties that impact both his desire and ability to be successful at MDI High School." (R. at 132). He diagnosed N.S. with major depressive disorder with chronic moderate severity and stated "[c]onsideration should be given for all options including more restrictive options such as a residential program," and if N.S. does not remain involved in school, "he will require an intensive community based treatment team to be successful." (R. at 67, 132).

On October 24, 2002, as part of a triennial review, Gary Burgess, M.S., conducted an educational assessment on N.S. (R. at 67, 165–67). Based on testing, Mr. Burgess made a number of suggestions on areas of educational benefit for N.S. (R. at 165–67). A classroom observation of N.S. was scheduled for November 15, 2002, but N.S. failed to show, and his classroom teacher commented: "I have only had him in class

once or twice since the start of the term." (R. at 67, 162–63).

The PET met on November 18, 2002 to conduct N.S.'s triennial review, but the meeting could not be completed; it reconvened on November 25, 2002 [3] and resulted in a new IEP initiated on December 2, 2002. (R. at 67, 137, 139–45). The new IEP continued N.S.'s academic program and accommodations without change and agreed to pay for counseling with a licensed clinician. (R. at 67, 137–38). It provided N.S. would receive counseling services from a contracted counselor for an hour once a week and exempted him from the school attendance policy as it pertained to homeroom tardiness. (R. at 67, 141, 144).

In December 2002, N.S. stopped seeing Dr. Hawkins. (R. at 68, 693, 696). In either December 2002 or January 2003, without his mother's or Dr. Hawkins's knowledge, he stopped taking his medication. (R. at 68, 696–97). In December 2002, he stopped attending school completely and became disruptive and disrespectful at home and extremely withdrawn. (R. at 68, 434–45). In January 2003, Dr. Hawkins recommended Ms. Z. consider residential mental health treatment, noting that "the goal would be to maintain regular school performance, promote basic self care, provide vigorous treatment for depression, teach social comportment, and improve [N.S.'s] confidence." (R. at 68, 135). Dr. Hawkins gave Ms. Z. a list of residential treatment programs in Maine and New England, including KidsPeace, Hampstead Hospital, and Brattleboro Retreat.[4] (R. at 68, 712–73). Concerned that N.S.'s issues with his mother could interfere with his attendance, Dr. Hawkins concluded a day program would not be appropriate. (R. at 68, 713).

The PET met on January 17, 2003 to discuss N.S.'s problem with school attendance. (R. at 68, 130–31). The PET "talked at length about possible hospitalization or residential placement" and gave Ms. Z. the names of residential programs at Spurwink and Sweetser. (R. at 68, 131, 435). Ms. Z. followed up with Spurwink and Sweetser, but N.S. did not meet their criteria for placement, because he "was not violent towards himself or others [and] was not suicidal." (R. at 68, 435–36). Ms. Z. told the PET that Dr. Hawkins had discussed two out-of-state hospitals as placement options, but Ms. Z. was unsure if N.S. would go to a residential program if one were arranged and she did not feel she could force him to go. (R. at 131). The PET decided to have a conference call among Dr. Hawkins, Mr. McCarthy, Ms. Z, and Tug White, the Assistant Director for Union 92's Educational Cooperative. (R. at 131). Mr. White said he would contact WINGS, an organization that assists families in their homes to deal with children with emotional disabilities, and would initiate a referral for their assistance, if N.S. were referred to a more restrictive placement.[5] (R. at 131).

### D. School of Urban Wilderness Survival: March—April 2003

On February 11, 2003 Ms. Z. contacted Leslie Goldberg, an educational consultant,

---

**3.** The Hearing Officer's Decision states that the PET reconvened on December 2, but the record indicates the new meeting was November 25, 2002 and the new IEP was initiated on December 2, 2002. (R. at 67).

**4.** Dr. Hawkins testified that the SUWS program was a program similar to these clinical settings. (R. at 716).

**5.** Ms. Z. has pointed out she had stopped working with WINGS in the summer of 2002, because WINGS "was requiring I apply for [Medicaid]" and N.S.'s "medical financial needs were being met through his private insurance and me." (R. at 123).

to obtain assistance in identifying an appropriate placement for N.S. (R. at 68, 437, 513). In anticipation of making a referral, Ms. Goldberg reviewed N.S.'s records and evaluations. (R. at 68, 514–16). She did not consider any day treatment programs, because of N.S.'s serious resistance to attending school or even getting out of bed in the morning. (R. at 68, 521–22). Instead, she focused on what are termed, "emotional growth schools," which utilize art and group therapy. (R. at 68, 513–17, 526–27).

At Ms. Goldberg's recommendation, Ms. Z. became interested in SUWS, a wilderness program in North Carolina. (R. at 69, 521). SUWS, according to its literature, is "designed to be a powerful intervention for students that need structure, supportive counseling, motivational improvement, and the development of self-esteem, self-reliance, and self respect . . . . [S]tudents are expected to complete a rigorous course of experiential instruction that addresses fundamental curriculum areas." (R. at 69, 352). The curriculum areas include Creative Writing, Healthy Living, Psychology, Physical Education, Social Studies, Outdoor Leadership, English, Environmental Studies, First Aid, Personal Development, and Home Economics. (R. at 69, 352). On February 25, 2003, Ms. Z. filed an application for N.S. to attend SUWS's five to seven week program.[6] (R. at 622). N.S. had been accepted into the SUWS program by February 27, 2003, the next PET meeting. (R. at 126).

The reason for the February PET meeting was to discuss N.S.'s educational programming and attendance and to hear the results of Ms. Z.'s research on programs. (R. at 68–69, 126). Ms. Z. informed the PET she had contracted with Ms. Goldberg who recommended SUWS. (R. at 69, 126). She said a recommendation for subsequent placement would be developed while N.S. was attending SUWS. (R. at 69, 126). There was some discussion about the Liberty School, Lamoine School District's alternative high school, but the minutes reflect N.S. was not ready for that placement "until he start[ed] acknowledging his issues." (R. at 69, 126). The PET denied the request for placement at SUWS for the following reasons: 1) the need to ensure it is an "approved education placement"; 2) the need for more information, i.e., whether high school tuition could be transferred to SUWS; 3) the need "to be aware of the educational program"; 4) the need to determine whether SUWS bills separately for its educational component; and, 5) the need to determine the mental health versus educational aspects of the SUWS program. (R. at 69, 127–28). The minutes state the placement at SUWS was "a parental placement." (R. at 128).

N.S. attended SUWS from March 7, 2003 to April 23, 2003, under an Individualized Service Plan prepared by his SUWS therapist, Leah Madamba, a Licensed Professional Counselor (L.P.C.) in the state of North Carolina. (R. at 69, 374–78, 565). This plan included a series of both long-term and short-term goals: 1) working towards an understanding of why he was in the program; 2) challenging his past beliefs through the use of individual therapy; 3) developing critical thinking skills; 4) working on motivation; 5) decreasing his pattern of negative, hostile, and defiant

6. The Hearing Officer's Decision states the SUWS program lasts four to six weeks. (R. at 76). The February 27, 2003 PET minutes state that the SUWS program is a four to six week program; however, Ms. Goldberg testified that the program "generally runs five to seven weeks" and, when students are being tested, "it's generally seven weeks." (R. at 126, 522). N.S. actually attended the program for 48 days. (R. at 69, 578).

behavior towards parents, teachers, and other authority figures; 6) improving physical fitness; 7) developing and demonstrating more effective social skills in maintaining friendships; 8) increasing his ability to care for himself; and, 9) increasing positive family interaction. (R. at 69, 374–78).

On March 30, 2003, while N.S. was at SUWS, Michelle Lechman, Ph.D., a licensed psychologist, completed a psychological evaluation of N.S. (R. at 69, 360–73). Dr. Lechman recommended placement in an emotional growth boarding school following SUWS. (R. at 70, 372). She emphasized an emotional growth school would place N.S. in "a structured environment with clear, consistent limits, and consequences for his negative attitude and passive-aggressive and oppositional behavior." (R at 372). She also recommended regular individual psychotherapy, group therapy, and family therapy, and a school environment that specializes in working with students with learning disabilities and ADHD. (R. at 70, 372–73). Dr. Lechman opined that, without a high level of structure, N.S. "is at substantially increased risk for academic failure, worsening social and emotional difficulties and family conflict." (R. at 372).

At the March 31, 2003 PET meeting, Ms. Sereyko informed Ms. Z. that SUWS was not an approved school. (R. at 70, 116). She commented that at the end of the program, SUWS could submit a list of the activities and classes N.S. had participated in and the district could then determine what credits N.S. would receive. (R. at 70, 116). Ms. Z. apprised the PET that at the end of the program, SUWS would likely recommend a "therapeutic boarding school with the emphasis of college prep or learning disabled kids." (R. at 70, 117).

Ms. Sereyko explained she had researched a possible day treatment program at KidsPeace in Ellsworth, which was not yet operating, but was going through a certification procedure with the State Department of Education. (R. at 70, 117, 906). Ms. Z. refused to consider KidsPeace, explaining she did not believe N.S.'s needs were compatible with the needs of KidsPeace students. (R. at 70, 117). Ms. Sereyko reminded Ms. Z. that the school district had a responsibility to consider the least restrictive environment—attempting to maintain his program as close to home as possible. (R. at 117). Ms. Z. responded that N.S. was now in a therapeutic environment, and as a parent, she intended to keep him in an environment that would keep helping him. (R. at 117). The March 31, 2003 PET minutes end by stating that the PET would make its recommendations after N.S. had completed the SUWS program and the recommendation for further schooling had been finalized. (R. at 117–18).

### E. The Academy at Cedar Mountain

Near the end of the SUWS program, Ms. Goldberg proposed three residential programs for N.S.: Hidden Lake in Georgia,[7] the King George School in Vermont, and Cedar Mountain in Utah. (R. at 71, 538). She knew of no schools near Lamoine that could provide "everything that he needed." (R. at 538). She thought N.S. needed a school that included an emotional growth program and a good art program, as well as one that understood the needs of students with learning disabilities. (R. at 71, 538). Although Ms. Goldberg was not presented with the KidsPeace option at that time, she later testified KidsPeace would be a "hostile milieu" that could negatively impact N.S.

---

7. The record indicates that Hidden Lake is located in Georgia (R. at 538), but the Hearing Officer stated it was located in California. (R. at 71).

(R. at 72, 535). N.S. chose Cedar Mountain and transferred there after completing SUWS. (R. at 71, 540–41).

Cedar Mountain is a small, structured boarding school. (R at 71, 630). According to its owner, Jody Tuttle, she founded Cedar Mountain on February 1, 2000 after working in both a traditional boarding school and a residential treatment facility. (R. at 629). She had identified a subset of students who did not need residential treatment, but were falling through the cracks in either public schools or traditional boarding schools. (R. at 629–30). Cedar Mountain offers a more structured academic program than traditional schools and also teaches

> [S]ocial and emotional intelligence, which includes learning how to learn, listening and oral communication; adaptability, the ability to creatively think and solve problems, particularly in response to barriers or obstacles; personal management ... self esteem goal setting, self motivation ... pride in work accomplished, group effectiveness ... inner-personal skills, negotiation team work, organizational effectiveness and leadership.

(R. at 630–31). As of September 2003, Cedar Mountain had a total of fifteen students and twenty-eight employees, including five teachers. (R. at 631).

The students' entire time is fully programmed with recreational, social, and academic activities. (R at 71, 632–34). The students are accompanied at all times by a teacher or counselor. (R. at 71, 633). Although there is no therapeutic component to the program, occasionally a counselor will come in from outside, if necessary. (R. at 71, 634). Cedar Mountain has no special education staff; there is a special education consultant who develops programs for individual students. (R. at 71, 636–37). Cedar Mountain is accredited by

the Northwest Association of Schools and Colleges. (R. at 71, 638). It is designed to be a one-year program with three phases: 1) The School of Integrity, focusing on friendship, honesty, and organization; 2) The School of Dedication, focusing on cooperation and gratitude; and, 3) The School of Excellence, focusing on goals and transition. (R. at 71, 651–54). Cedar Mountain conducts telephone conferences with the family and holds four annual parent seminars with mandatory attendance at three. (R. at 71, 89, 654). The program is year-round, with two long semesters and a one-month summer term. (R. at 71, 656). Cedar Mountain is designed for students who do not have "heavy clinical needs." (R. at 639). The students need help academically and are likely to respond to structure. (R. at 639). However, they are not "out of control kids"; a student who is "real defiant" and needs "serious therapy" would not fit in. (R. at 639–40).

## F. KidsPeace Day Treatment Program

KidsPeace has been operating as a residential treatment program for over 127 years. (R. at 748–49). It began as an orphanage for children whose parents had died from influenza. (R. at 749). Over time, however, it responded to a need for schools and residential facilities for children with emotional disabilities. (R. at 749). As of September 2003, KidsPeace's Ellsworth program had between fifty-two and fifty-five residential students, one full-time psychiatrist, one part-time psychiatrist, one psychologist, five social workers, case managers, nursing staff, and a teacher and ed-tech in every classroom. (R. at 751–52). The teachers are special education certified and have participated in all state-mandated mental health and educational training. (R. at 752). All teach-

ers have been trained in Life Space Counseling Intervention, which teaches them how to talk with the students, how to relate to different disabilities, how to respond to the students, and how to work with them. (R. at 761). KidsPeace is licensed by the Maine Department of Human Services (DHS) for the mental health part of the program. (R. at 752). One classroom is for students in seventh and eight grades; one classroom is for students in ninth grade; and one classroom is for students in tenth and eleventh grades. (R. at 753). The academic programs are closely aligned with the Maine Learning Results, and the curriculum parallels the curriculum at Ellsworth High School so there is no loss when students transfer to the public high school. (R. at 757–58).

Although the precise dates are not clear from the record, during 2003 KidsPeace was developing a day treatment program. (R. at 793–94). During the winter, spring, and summer of 2003, the KidsPeace day treatment program was not yet operational; in fact, the program received certification from the State on September 4, 2003, the same day as the due process hearing. (R. at 72, 794–95). At the September 4, 2003 hearing, Theresa Novotnak, the Special Education Director for the Ellsworth KidsPeace, testified the day treatment program was "open for business," but no students were actually enrolled. (R. at 72, 794–95). The KidsPeace day treatment program had not yet hired new personnel, but anticipated the typical presenting problems would include trauma originating with physical/sexual abuse, sexual perpetrator, aggressive acting out behavior, firesetting, depression, or delinquency. (R. at 323). KidsPeace designed the day treatment program to educate its students with its residential students. (R. at 761–62).

### G. The June 13, 2003 PET Meeting

The PET met on June 13, 2003 and rejected Cedar Mountain as a placement, noting it was not a special education school and was neither approved nor certified by the State of Maine. (R. 71, 90). The PET decided against reimbursing Ms. Z. for the tuition at SUWS and Cedar Mountain and for Ms. Goldberg's fees. (R. at 90). Ms. Sereyko again discussed the day treatment program to be offered by KidsPeace. (R. 71, 91). Even though it was not yet up and running, Ms. Sereyko explained that the KidsPeace day treatment program was planning to provide special education services, home-school coordinated program assistance, a level system, life space interviews, a therapeutic method to address issues as they arose, art programming, and an Outward Bound-type program. (R. 71, 91). Ms. Z. responded she would be willing to consider the KidsPeace program, but only as a transition back home. (R. at 91). She felt N.S. needed twenty-four hour programming and stated her intention to keep N.S. at Cedar Mountain, where he was doing well. (R. 71–72, 91). The PET developed an updated IEP, which contained emotional, math, writing, and reading goals. (R. 72, 99–106). It also offered six hours a day, five days a week direct instructional services, two weekly counseling sessions, and two weekly ESY[8] counseling sessions. (R. 72, 95). The PET ordered placement at the day treatment program at KidsPeace. (R. at 91). On July 25, 2003, Ms. Z requested a due process hearing, challenging the PET decision to place N.S. at KidsPeace and its denial of reimbursement for tuition Ms. Z paid to SUWS and Cedar Mountain.

### H. Ms. Z.'s Reimbursement Requests

Ms. Z. requested Lamoine to reimburse her for the following expenses:

---

8. ESY is an acronym standing for "Extended School Year."

1) SUWS: March 7, 2003—April 23, 2003: $17,845.00;

2) Leslie Goldberg: $3,000.00; and

3) Cedar Mountain: $60,000.[9]

## I. Hearing Officer's Decision

Following an extensive hearing, the Hearing Officer concluded:

(1) Lamoine "failed to provide an I.E.P. that was reasonably calculated to provide academic benefit for the 2002–2003 school year, due to the failure to address all areas of need, i.e. social, emotional, and mental health, all of which had a direct impact on educational benefit";

(2) SUWS was "an appropriate placement for [N.S.]" and Ms. Z. was "entitled to reimbursement of costs associated with this placement";

(3) Lamoine must reimburse Ms. Z. for the fees paid to Ms. Goldberg;

(4) N.S.'s 2003–2004 school year I.E.P. "was not reasonably calculated to provide educational benefit in the least restrictive educational setting," because Lamoine failed to identify and offer an appropriate educational placement for the period beginning at the completion of the SUWS program; and

(5) Cedar Mountain was an appropriate placement until Lamoine identified and offered "an appropriate, less restrictive day program in or around Hancock County." (R. at 75–78).

## II. STANDARD OF REVIEW

Lamoine invokes this Court's jurisdiction under 20 U.S.C. § 1415(i)(2)(B), which provides:

In any action brought under this paragraph, the court—

(i) shall receive the records of the administrative hearing;

(ii) shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(B).

■ A district court's scrutiny of a hearing officer's decision under this statutory standard falls short of de novo review. *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir.1993)(this intermediate standard requires a more critical appraisal of the agency determination than clear error analysis, but which falls short of complete de novo review); *see also Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 989 (1st Cir.1990), *cert. denied*, 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991); *Farrin v. Maine Sch. Admin. Dist. No. 59*, 165 F.Supp.2d 37, 43 (D.Me.2001); *Greenbush Sch. Comm. v. Mr. & Mrs. K.*, 949 F.Supp. 934, 937 (D.Me.1996). This grant of jurisdiction "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Lenn*, 998 F.2d at 1086 (citation omitted). Rather, the court's role in reviewing a hearing officer's decision is one of "involved oversight," giving "due weight" to the expertise of the administrative agency. *Id.* at 1087.

■ The district court's standard of review is synthesized as follows:

First, the Court carefully reviews the record of the due process hearing. Sec-

---

**9.** These figures do not appear in the Hearing Officer's Decision. The SUWS figure is taken from an exhibit. (R. at 382–84). The Leslie Goldberg fee is taken from her testimony. (R. at 515–16). Cedar Mountain's annual fees are found in Lamoine's Complaint, which Ms. Z. admitted. (Compl. at ¶ 19 (Docket # 1), Answer at ¶ 19 (Docket # 8)).

ond, appropriate deference is given the Hearing Officer and his expertise, particularly with regard to factual determinations. Finally, the Court makes an independent decision whether the hearing officer's determination is supported by a preponderance of the evidence. *Mr. & Mrs. K.,* 949 F.Supp. at 938. When questions of law are also presented, the court makes an independent determination whether the requirements of the IDEA have been met. *Farrin,* 165 F.Supp.2d at 43. The party challenging the hearing officer's decision "must carry the burden of proving that the educational agency erred in its substantive judgment." *Roland M.,* 910 F.2d at 995. Here, that burden rests with Lamoine.

## III. DISCUSSION

### A. Overview of the IDEA

To qualify for federal funding under the IDEA, a state must offer "all children with disabilities ... a free appropriate public education." 20 U.S.C. §§ 1400(c), 1412(a)(1). Such "appropriate" education must be custom tailored to address the specific child's "unique needs" in a way "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

The primary tool for implementing a "free appropriate public education" under the IDEA is the student's IEP, a written document detailing the student's current educational level, the short-term and long-term goals of the educational plan, the specific services to be offered (including transition services), and a set of objective criteria for subsequent evaluation. 20 U.S.C. §§ 1401(11), 1414; *Lenn,* 998 F.2d

at 1086. The IEP is developed by a team of persons most familiar with the student's needs including the student's teachers and parents.[10] *Greenbush,* 949 F.Supp. at 938. "The ultimate question for a court under the Act is whether a proposed IEP is adequate and appropriate for a particular child at a given point in time." *Burlington v. Dep't of Educ.,* 736 F.2d 773, 788 (1st Cir.1984)(*Burlington I*), aff'd, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)(*Burlington II*). "[A]n IEP is designed as a package." *Lenn,* 998 F.2d at 1089. It must target "*all* of a child's special needs, whether they be academic, physical, emotional, or social." *Id.* (citations omitted); *see also Roland M.,* 910 F.2d at 992 ("purely academic progress" is not the only indication "of educational benefit"); *Timothy W. v. Rochester, N.H. Sch. Dist.,* 875 F.2d 954, 970 (1st Cir.1989), *cert. denied,* 493 U.S. 983, 110 S.Ct. 519, 107 L.Ed.2d 520 (1989)("education" under the IDEA is broadly defined). Parents who disagree with the PET's IEP have a right under the Act to an administrative hearing to determine if the IEP is appropriate. 20 U.S.C. § 1415(f); *Lenn,* 998 F.2d at 1086. The IDEA provides a right of action to either the parents or the school to challenge the administrative hearing in either state or federal court. *Id.* § 1415(i)(2).

A federal court's review of a hearing officer's decision requires a two-part inquiry: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034. Here, there are no alleged procedural vio-

---

**10.** In Maine, the team that develops the IEP is called the Pupil Evaluation Team ("PET"). *Rome Sch. Comm. v. Mrs. B.,* No. Civ. 99–CV–

20–B, 2000 WL 762027, at *8 (D.Me. Mar.8, 2000).

lations, and therefore, the first question need not be addressed. The controversy is whether the Hearing Officer correctly found N.S.'s IEPs were not reasonably calculated to enable him to receive educational benefits. In assessing the I.E.P., this Court is guided by the principles set forth in the First Circuit's *Lenn* decision:

> The IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP. Appropriateness and adequacy are terms of moderation. It follows that, although an IEP must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential.

*Lenn*, 998 F.2d at 1086.

The IDEA also has a preference for mainstreaming disabled students. *Id.* "[T]his preference signifies that a student 'who would make educational progress in a day program' is not entitled to a residential placement even if the latter 'would more nearly enable the child to reach his or her full potential.'" *Id.* (quoting *Abrahamson v. Hershman*, 701 F.2d 223, 227 (1st Cir.1983)). A student's IEP should be targeted to achieve the child's education in the least restrictive setting. 20 U.S.C. § 1412(a)(5); *Roland M.*, 910 F.2d at 992–993 ("Mainstreaming may not be ignored,

even to fulfill substantive educational criteria."). In keeping with the mainstreaming preference, IDEA's regulations require that public schools ensure the placement of a disabled child "[i]s as close as possible to the child's home." 34 C.F.R. § 300.552(a)(3). Whenever possible, the child should be "educated in the school that he or she would attend if nondisabled." *Id.* § 300.552(c). Although the default placement for a student under the IDEA is the local school, an IEP can override this default in situations where the student would not receive an educational benefit at the local school. *Mr. & Mrs. K*, 949 F.Supp. at 939. A hearing officer is guided by these competing concerns when reviewing a child's proposed IEP. *Id.*

Where a parent is dissatisfied with the IEPs developed by the school district for her child, the Supreme Court has provided the parent may, at her own financial risk, unilaterally place her child in a private school. *Burlington II*, 471 U.S. at 370, 105 S.Ct. 1996. If a federal court later determines that: (1) the student was in need of special education services; (2) that the IEP developed by the school district was inappropriate; (3) that the unilateral placement by the parent was proper; and (4) the cost of the private education was reasonable, then the court may order reimbursement for the parents.[11] *See Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 12–16, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993). "Reimbursement is a matter of equitable relief, committed to the sound

---

11. The IDEA provides:
(ii) Reimbursement for private school placement.
If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency,

a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.
20 U.S.C. § 1412(a)(10)(C)(ii).

discretion of the district court" and is "usually reserved for parties who prevail at the end of a placement dispute." *Roland M.*, 910 F.2d at 999 (citations omitted).

■ "While reimbursement is not barred because the private school fails to meet the standards of the state educational agency, parents 'are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act.'" *Rafferty v. Cranston Pub. Sch. Comm.*, 315 F.3d 21, 26 (1st Cir.2002)(quoting *Carter*, 510 U.S. at 13–15, 114 S.Ct. 361). As to the restrictive nature of residential placements, parents seeking an alternative placement may not be subject to the same mainstreaming requirements as a school board. *See M.S. v. Bd. of Educ. of City Sch. Dist. of Yonkers*, 231 F.3d 96, 105 (2d Cir.2000), *cert. denied*, 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. § 300.302. "States may not escape responsibility for the costs properly associated with a residential placement simply by stating that the placement addresses physical, emotional, psychological, or behavioral difficulties rather than or in addition to educational problems." *Vander Malle v. Ambach*, 667 F.Supp. 1015, 1039 (S.D.N.Y.1987). "As long as the child is properly educable only through a residential placement, when the medical, social or emotional problems that require hospitalization create or are intertwined with the educational problem, the states remain responsible for the costs of the residential placement." *Id.; see also*

*McKenzie v. Smith*, 771 F.2d 1527, 1534 (D.C.Cir.1985)(upholding residential placement for a child who was both seriously emotionally disturbed and learning disabled); *Abrahamson*, 701 F.2d at 227 (district court appropriately ordered residential placement to provide necessary around-the-clock reinforcement); *Papacoda v. Connecticut*, 528 F.Supp. 68, 72 (D.Conn.1981)(federal law requires state funding when plaintiff's needs require a residential placement to integrate educational and therapeutic services); *Gladys J. v. Pearland Indep. Sch. Dist.*, 520 F.Supp. 869 (S.D.Tex.1981)(schizophrenic child's social, medical and emotional difficulties sufficiently intertwined with her educational problems to require residential placement). Thus, in deciding if a school must fund a residential placement, the court must determine whether the child requires the residential program to receive educational benefit. *See Rowley*, 458 U.S. at 203, 102 S.Ct. 3034.

### B. Adequacy and Appropriateness of IEPs for the 2002–2003 School Year [12]

■ Lamoine asserts the Hearing Officer erred when she concluded Lamoine had failed to offer appropriate programming during the 2002–2003 school year.

#### 1. September 2002–December 2002

■ Lamoine contends the Hearing Officer erred in concluding N.S.'s IEPs for the fall 2002 were not reasonably calculated to provide N.S. academic benefit, because they failed to address N.S.'s social, emotional, and mental health needs. Lamoine notes the parties agreed to all PET decisions from September through December 2002. It also points out that N.S. had made progress during the year 2001–2002,

---

**12.** The educational component of N.S.'s IEPs is not being challenged.

and this progress had continued through the summer. By September 2002, Lamoine says "all parties agreed that he should enter MDI High School in a primarily regular education program, with 25% special education support in his areas of disabilities." (Pl.'s Br. at 13 (Docket #15)). Lamoine further says when N.S. began coming late to school, the PET ordered counseling with Jeff McCarthy on November 25, 2002. Lamoine complains the Hearing Officer was unduly influenced by N.S.'s "precipitous drop" in December 2002 and her rejection of Lamoine's efforts during this period "amounts to the hindsight decisionmaking that the First Circuit has prohibited." (Pl.'s Br. at 14–15).

Two IEPs were developed in 2002: one on September 9, 2002 and the other on November 25, 2002. (R. at 175–78, 139–44). The September 9, 2002 IEP did not provide any counseling services or other means to address N.S.'s emotional, behavioral, and mental health issues. The September 9, 2002 IEP specifically identifies his attendance as an issue: "[Ms. Z] also shared a concern with the team that [there] might be a need in the future to have a modified school day for [N.S.] should difficulties arise with getting [him] to school [within] the traditional hours." (R. at 175). The IEP states: "[N.S.] will require close monitoring in terms of attendance ...." (R. at 176). The record further establishes N.S. failed to attend class on November 15, 2002, the day he was scheduled to be observed, and his teacher acknowledged N.S. had attended his class only once or twice the entire semester. (R. at 162–63). Nevertheless, Lamoine failed to address this issue until November 25, 2002, in an IEP that did not become effective until December 2, 2002. (R. at 139).

The November 25, 2002 IEP begins with Ms. Z.'s expressions of concern about N.S.'s absences from school and her request that work missed due to absences be made up during the school day. (R. at 139). However, in evaluating his level of performance, the IEP states: "[N.S.] is now attending school on a full time basis and is doing quite well." (R. at 139). Later, the IEP reiterates the need for "close monitoring in terms of attendance." (R. at 140). Lamoine's November 25, 2002 response was two-fold: 1) to assign counseling services for one hour per week with Mr. McCarthy; and, 2) to waive the school attendance policy on tardiness. (R. at 141, 144). The November 2002 IEP did not explain the objectives and goals of the counseling or how counseling would improve N.S.'s attendance problems. The Hearing Officer observed that the waiver of the homeroom tardy policy was "certainly a disincentive to regular and prompt attendance." (R. at 74).

N.S.'s array of difficulties, particularly his problems with attendance, had been extensively documented by the summer of 2002. He had failed to attend school regularly in the early fall of 2001, before transferring to Lamoine, and had been tutored at home during the rest of the school year. When the PET met on September 9, 2002, Ms. Z. expressed specific concern about "getting [N.S.] to school." (R. at 175). Moreover, within two weeks of the September 9, 2002 IEP, at the request of Ms. Z., a second PET meeting had been held to address his persistent tardiness, due to his depression, sleep disorder, and medication.

N.S.'s tardiness and attendance failures are clearly not the sole responsibility of Lamoine. The PET cannot rouse N.S. out of bed or escort him to school on time. But, this Court is not called upon to decide the fruitless and unanswerable question of fault. In this case, N.S.'s absence was linked to his disability, and it is unarguable

if N.S. was not in school, he could not be said to be receiving "a free appropriate public education." Recognizing the inherent limitations of Lamoine over N.S., the focus of the inquiry is what, if anything, Lamoine did and what, if anything, should it have done to address his attendance failure. If the record reflected the more active intervention of Lamoine between September 23, 2002 and November 25, 2002, a different conclusion might be mandated.

However, apart from assigning counseling services with Mr. McCarthy in October 2002, there is no evidence of any cohesive attempt to assure N.S.'s attendance and improve his tardiness. In her decision, the Hearing Officer comments on the IEP's failure to include "any plan or supports to address these non-attendance issues." (R. at 74). What those plans or supports could or should have been is beyond the ken of this Court and, "in recognition of the expertise of the administrative agency," *Burlington I*, 736 F.2d at 792, the Hearing Officer is entitled to "due weight," *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034; *Colin K. v. Schmidt*, 715 F.2d 1, 5 (1st Cir.1983).

Lamoine is incorrect, however, in relying on *Roland M.* and arguing that the Hearing Officer improperly used "hindsight decisionmaking" when concluding Lamoine failed to provide N.S. with an academic benefit during this time. It is certainly true an IEP must "take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated." *Roland M.*, 910 F.2d at 992. But, here, N.S.'s attendance problems were apparent by early September and persisted throughout the fall. When a student is enrolled at school, a free appropriate education requires at a minimum that the student be present and on time. N.S. was not attending class and, when attending, he arrived late. This Court cannot conclude an IEP, which failed to address in some fashion N.S.'s persistent absence and tardiness, could be "adequate and appropriate." *Burlington I*, 736 F.2d at 788.

### 2. December 2002—March 31, 2003

#### a. January 17, 2003 PET Meeting

 Lamoine next objects to the Hearing Officer's conclusion concerning the PET's actions from December 2002 to March 31, 2003. The Hearing Officer concluded that even though Lamoine knew N.S. "was not attending school and had various psychiatric diagnoses," all the PET had done was "pass along possible referrals" to Ms. Z. (R. at 74). She noted the PET failed to "utilize the psychological and psychiatric reports and available professional expertise to assist the team in developing a plan that might have a chance to work, a plan that incorporated behavioral and emotional supports, rather than simply academic services." (R. at 74–75).

Lamoine argues its actions are "hard to fault." (Pl.'s Br. at 17). It points out that N.S. stopped taking his medications without notice to anyone and that this action led to his precipitous decline in December. It contends the January 17, 2003 PET meeting was timely, that the PET offered to investigate residential placements for N.S., but was blocked by Ms. Z., who then explored them on her own, and that the PET was faced with a *"fait accompli"* when Ms. Z. announced on February 27, 2003 N.S. was going to attend SUWS. (Pl.'s Br. at 17).

Lamoine cites *M.C. ex rel. JC v. Central Regional School District*, 81 F.3d 389, 396–97 (3d Cir.), *cert. denied*, 519 U.S. 866, 117 S.Ct. 176, 136 L.Ed.2d 116 (1996), for the proposition that a school district should have a reasonable period of time to

review and develop a programming alternative once it becomes clear the student's IEP is not working. Specifically, in addressing the student's right to compensatory education, the Third Circuit in *M.C.* stated this right "should accrue from the point that the that the school district knows or should know of the IEP's failure" and a school district "may not be able to act immediately to correct an inappropriate IEP; it may require some time to respond to a complex problem." *Id.*

Here, Lamoine knew or should have known N.S. was having attendance and tardiness problems from at least early September 2002; by December 2002, N.S. had effectively stopped attending school. Nevertheless, on January 17, 2003, when the issue came up, Lamoine could not even quantify the amount of time N.S. had missed from school: "There are no clear indications of how many days [N.S.] has missed, but he pretty much hasn't been in school since before the Christmas Vacation." (R. at 131).

The January PET minutes confirm that the PET discussed the following alternatives: 1) hospitalization; 2) a new medication regime; 3) WINGS; and, 4) residential treatment. The PET talked "at length about any viable alternatives or possible programs that might help with ensuring a free appropriate public education." (R. at 131). Regarding hospitalization, the minutes reflect Mr. White gave a negative report on one of the state hospitals, but "didn't know the other." (R. at 131). Regarding medications, absent information from Dr. Hawkins, no conclusions could be reached. (R. at 131). Regarding WINGS, Mr. White offered to contact WINGS, but this was in the face of Ms. Z.'s prior unproductive experience with WINGS. (R. at 131). The upshot was the PET decided to have a conference call among Dr. Hawkins, Mr. McCarthy, Ms. Z., and Mr. White "to see if there might be an agreeable game plan." (R. at 131). Regarding residential alternatives, Ms. Z. recalled the PET gave her the names of two Maine facilities, Sweetser and Spurwink, but when she contacted them and others, they informed her N.S. did not meet their criteria. (R. at 122, 435–36). There is no indication in the January 2003 minutes that the PET referred Ms. Z. to KidsPeace, to any other day treatment program, or offered to assist her with the investigation of residential treatment alternatives.

Ms. Z. later summarized what the minutes themselves reflect: "At the PET I did discuss my feelings of I needed help. I needed help trying to find the right help for my kid. He was not accepting traditional therapy. And I think the school honestly didn't—they really didn't know what to do." (R. at 435). In *M.C.*, the Third Circuit made the following statement:

> [A] child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) nor be abridged because the district's behavior did not rise to the level of slothfulness or bad faith. Rather, it is the responsibility of the child's teachers, therapists, and administrators—and of the multi-disciplinary team that annually evaluates the student's progress— to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly.

*M.C.*, 81 F.3d at 397.

The PET minutes confirm this multi-disciplinary group of professionals was understandably flummoxed. They faced a young man who was not attending school, who had proven refractory to counseling, and who was at risk of failure. Instead of galvanizing the PET, the minutes confirm

the PET, in a manner inconsistent with *M.C.*, turned N.S. over to Ms. Z., charging her with the sole obligation to act for her son.

### b. February 27, 2003 PET Meeting

Between the January 17, 2003 and February 27, 2003 PET meetings, Ms. Z. engaged Ms. Goldberg, who investigated alternative placements; and N.S. applied for and was accepted to SUWS. Although the PET had proposed a conference among Dr. Hawkins, Mr. McCarthy, Ms. Z., and Mr. White, the February 2003 minutes fail to confirm any such conference took place.[13] Instead, the February 2003 minutes focus on what Ms. Z. had accomplished over the last five weeks and her decision to send N.S. to SUWS.

Responsibility for N.S. having devolved from the PET to Ms. Z., the PET criticized her solutions. It raised numerous issues, ranging from state approval to mental health treatment, and ended by refusing to approve the SUWS program Although the minutes reflect the PET's criticism of Ms. Z.'s actions, there is little, if any, reference to the PET's constructive alternatives. There is no mention of day treatment programs, including KidsPeace. There is no mention of other residential treatment alternatives. Instead, the PET criticized Ms. Z.; they questioned why she had not completed the WINGS information, ignoring her earlier statements that WINGS was insisting she apply for Medicaid, when she had other resources. (R. at 127). They also criticized N.S., stating.: "[N.S.] needs to follow the advice/recommendations of the program"; he was "in total denial of any difficulties he may have"; and the alternative high school was not available until N.S. "starts acknowl-

edging his issues." (R. at 126). The PET emphasized N.S.'s placement must be an "approved educational placement" and noted the need for "more information" about SUWS, including its "education program." (R. at 127). Contrary to *M.C.*, instead of acting as a cohesive multi-disciplinary group of professionals, the PET assumed a passive, negative, and restrictive role, rejecting Ms. Z.'s solutions, but failing to present its own.

### c. March 31, 2003 PET Meeting and the KidsPeace Offer

The next PET meeting took place on March 31, 2003. By this time, having started SUWS on March 7, 2003, N.S. was nearly halfway through the program. Lamoine characterizes this PET meeting as follows: "[T]he Team reconvened on March 31, and Lamoine rejected SUWS because it was not an educational placement and was not approved by the Maine DOE. Lamoine then offered the family a placement at the Kids' Peace day treatment program, which Ms. Z. rejected." (Pl.'s Br. at 16–17).

Lamoine's current characterization of the meeting is difficult to credit. The minutes tell a different story. The meeting begins with Mr. White giving Ms. Z. the "Parent of the Year Award" for placing N.S. in the SUWS program. (R. at 116). Contrary to Lamoine's current position, the minutes state:

L. Sereyko discussed her conversation with the program; they explained the program was not an approved school and at the end of the program they will present a list of activities/classes to the parent who then usually presents it to the school to determine what

---

**13.** If it did, there is no reference to any recommendations that flowed from the confer- ence.

courses/credits can be obtained. M. Gertler [a school guidance officer] agreed to review the list of classes/activities from the SUWS program.

(R. at 116). The minutes end: "Michelle Gertler will review the information from the SUWS to determine possible credits earned." (R. at 118). The March 31, 2003, minutes demonstrate that, although Lamoine had confirmed SUWS was not an approved school, it also agreed to review SUWS course content and determine what, if any, credits it could allow. The PET's rejection was modified by its willingness to review the SUWS curriculum and decide later on credit issues.

Moreover, to say the March 31, 2003 discussion about KidsPeace was an offer to place N.S. in the KidsPeace day treatment program is an exaggeration. The March 31, 2003 PET meeting focused on what N.S. was going to do upon completion of the SUWS program in late April 2003. The minutes reflect that Ms. Sereyko explained she had "researched a possible day treatment program" at KidsPeace and that she had "spoken to the [KidsPeace] Program." (R. at 117). Again, contrary to Lamoine's Brief, the minutes do not confirm an offer to place N.S. at KidsPeace. The KidsPeace day treatment program was not even operational in late April 2003 and was not licensed until September 4, 2003. At most, Ms. Sereyko suggested the KidsPeace day treatment program should be explored as a possible placement sometime in the future, a suggestion Ms. Z. rejected.

What the March 31, 2003 minutes reflect is the inevitable result of the PET's earlier transfer of responsibility to the parent. Ms. Z., having assumed by default the obligation to place her son at SUWS, was taking the next step and seeking further placement. During the meeting, Mr. White acknowledged what is apparent:

"[H]e does not believe a PET decision can be made at this time until the next step from [Ms. Z.] is presented to us." (R. at 117). The PET concluded by agreeing to reconvene when Ms. Z. "receives information [from] the SUWS program." (R. at 118).

### 3. Conclusion: IEPs 2002–2003

This Court concurs with the Hearing Officer's determination that Lamoine failed to provide IEPs reasonably calculated to provide academic benefit for the 2002–2003 school year, because the IEPs failed to address all areas of N.S.'s need. Lamoine failed to anticipate attendance and lateness problems, failed to account for his presence or absence from school and class, failed to act decisively when faced with his decompensation in December, abnegated its legal and professional responsibility, and when his mother filled the void, criticized her solutions.

■ This Court takes Lamoine's point about the SUWS program being presented as a *fail accompli*. Even if the PET intentionally or inadvertently charged Ms. Z. on February 27, 2003 with the obligation to seek out residential treatment alternatives, it did not authorize her to act for Lamoine to select and agree to pay for whatever residential placement she deemed appropriate, regardless of the IDEA's constraints. It is troubling there is no evidence Ms. Z. or (with her authorization) Ms. Goldberg informed Lamoine of Ms. Z.'s plans to send N.S. to an expensive, out-of-state program, until N.S. had been accepted and was on the verge of traveling to North Carolina. Ms. Z. had a right to insist Lamoine comply with its obligations under the law, but Lamoine also had a right to expect her cooperation in doing so.

But, the overriding right here is N.S.'s right to a free public education, a right that continued during the winter and

spring of 2003. As will be discussed, Lamoine's suggestion of the KidsPeace day treatment program was not available to N.S. until September 4, 2003. There is no hint from Lamoine of a reasonable alternative to SUWS, and the only evidence in this record of an alternative that accorded N.S. his legal rights is the SUWS program. If the evidence in this case permitted the conclusion Lamoine had in fact proposed a reasonable alternative to SUWS, this Court would be confronted with a different decision.[14]

## C. KidsPeace Offer and Order

Lamoine states that the "central issue in this case has always been Lamoine's offer of the [KidsPeace] day treatment program" (Pl.'s Br. at 17). Lamoine asserts the Hearing Officer "did not even mention this program offer, let alone review it, in terms of the March 2003 PET proposal." (Pl.'s Br. at 17). As just noted, however, it is erroneous to assert Lamoine made an offer for the KidsPeace day treatment program to Ms. Z. on March 31, 2003. Lamoine's next argument, however, is that the Hearing Officer should not have rejected the PET's June 13, 2003 order placing N.S. in the KidsPeace day treatment program This Court disagrees.

### 1. A Picture of N.S.

From the evidence in this case, a picture of N.S. emerges. In 2003, N.S. appears to be a creative, shy, gentle young man. Ms. Madamba described him in March 2003: "When he first came in, he was very quiet

and shy and reserved, appeared very child-like, kind of solemn at the same time . . . ." (R. at 577). Leslie Goldberg had similar impressions: "[N.S.] was, as described, a very soft spoken, almost feminine, not a rough and tough, heavy testosterone kind of a boy; young and mature, sweet, and yet, he was— he seemed to be wanting . . . ." (R. at 519–20). He was "very, very sensitive about peers" and was concerned he would be ostracized, ridiculed, and not accepted. (R. at 705). His greatest academic success has come from his artistic ability; the PET described N.S. as "very artistically creative and enjoys working with stained glass." (R. at 176).

Against this profile, there is another side of N.S. He can be irritable, defiant, vulgar, hostile, and generally difficult, particularly toward his mother. (R. at 694). He was diagnosed with a Major Depressive Disorder. (R. at 132). He had difficulty with "the most basic daily activities of living, such as, hygiene, sleep, meals, all of that." (R. at 696). His mother reported a persistent problem with bedwetting. (R. at 411–22). He could sleep as much as fifteen hours a day. (R. at 422). Although he has average to above average ability, he had a "long history of academic difficulty in school." (R. at 314, 694). As early as fifth grade, he received special education services and began to experience problems with self-esteem and confidence. (R. at 409). He continued to approach "tasks with a great deal of self doubt and a lack of confidence." (R. at 702).

14. Would a reinstitution of a period of home-based tutoring combined with an intensive period of psychiatric and psychological intervention have been a reasonable alternative? Would Sweetser, Spurwink or another Maine-based residential treatment program have accepted N.S. if Lamoine had intervened to assist Ms. Z.? What are the alternatives when the parent and teenager persistently fail in the notoriously difficult chore of getting the adolescent out of bed, dressed, and out of the house in the morning? Would a revised and more structured program at MDI have worked? There is no evidence in the record any of these alternatives were being pursued, leaving the sole viable option in the winter of 2003, the one Ms. Goldberg and Ms. Z. proposed.

## 2. N.S. and Ms. Z.

N.S. has had a difficult relationship with his mother. Ms. Z. is a single mother and has been the "only one person with him 24 hours a day." (R. at 714). Dr. Hawkins explained that "it's quite typical for young adolescents to direct all their bitterness and disappointment at their parents be- cause they're safe— it's a safe object for that bitterness and because they don't really subjectively perceive the problem as lodged in their own life." (R. at 695). N.S. certainly fit that pattern. His mother admitted that during their joint sessions with Dr. Hawkins, N.S. "spent much of the time verbally abusing me." (R. at 414). There was concern that, despite her best efforts, Ms. Z. was unable to deal with N.S. in a productive and reinforcing man- ner. (R. at 559–60). Dr. Hawkins testi- fied it had become "quite clear" to him that N.S.'s "antagonism towards his moth- er undermined— completely undermined her ability to help him and to be able to provide safe and [e]ffective care for him." (R. at 713).

## 3. The KidsPeace Day Treatment Program and N.S.

The KidsPeace day treatment program posed a number of problems. First, Dr. Hawkins thought N.S. would have difficul- ty even getting to the KidsPeace program on a daily basis. (R. at 713). Second, he expressed the view that Ms. Z.'s ability to deal with N.S. was compromised and agreed a period of separation would be preferable. (R. at 714–15). Third, Dr. Hawkins thought the residential treatment program should last a substantial period of time, as long as one year. (R. at 721).

Dr. Hawkins was not alone. Mr. McCarthy also testified that N.S. "was not having success at that time in a communi- ty-based situation, and I felt something more restrictive would be appropriate."

(R. at 459). Mr. McCarthy noted N.S. had not been "successful, effectively not engag- ing in any supports that had been provided for at least a couple of years." (R. at 459). He was concerned about whether N.S. would even be capable or willing to get out of bed in the morning and get to KidsP- eace. (R. at 464). He thought a residen- tial program would be better for him. (R. at 464).

## 4. The KidsPeace Environment and N.S.

Mr. McCarthy was also concerned N.S. would perceive the KidsPeace environment as negative and return to a state of social isolation and depression. He testified the KidsPeace population had "a mix of pretty significant clinical disorders, and the po- tential of [N.S.] not having his needs met. I would be concerned about that given the level of need that some of these disorders present as well as some of the presenting problems that's listed [in the KidsPeace materials]." (R. at 466). KidsPeace liter- ature described typical presenting prob- lems for its day program clients: trauma originating with physical/sexual abuse/ PTSD; sexual perpetrator; aggressive acting out behavior; fire-setting; depres- sion, and delinquency; whereas the resi- dential clients have a variety of diagnoses, including Pervasive Development Disorder (PPD), Obsessive Compulsive Disorder (OCD), oppositional defiant, conduct disor- der, Asperger's, and depression. (R. at 323, 775). Further, the day program clients would be educated with the residen- tial clients and N.S. would be subject to the students' "pecking order." (R. at 761– 62, 779).

## 5. N.S.'s Need for a Residential Program

Mr. McCarthy stressed that the residen- tial part of the program was a critical element of any placement:

[T]he main factor would be given that a residential program provides the 24 hour supports, and that what I understand up to this point from reports that have been involved with [N.S.] is that he is successful, has been successful with a residential program. There's no parts of the day that are left for him to really be on his own, per se, and each part of the day something is going on in terms of the structure and consistency, and he has available people to either engage with or to have them engage him if there's a problem.

(R. at 471).

### 6. Conclusion

This Court concludes Lamoine's attempt to place N.S. at the KidsPeace day treatment program was inappropriate. This is not to say that the KidsPeace day treatment program will continue to be inappropriate for N.S. in the future, only that in June 2003, Lamoine's order was inappropriate. It failed to address N.S.'s underlying sensitive personality, his difficult relationship with his mother, his need for a period of separation from his mother, and the potentially adverse consequences of placing N.S. within KidsPeace's client mix.

### D. Appropriateness of SUWS Placement

Having concluded the KidsPeace day treatment program was inappropriate, this Court must next determine whether N.S.'s placement at SUWS was appropriate. Lamoine contends N.S.'s placement at SUWS was improper under the IDEA for the following reasons: (1) SUWS was not the least restrictive placement, because N.S. was 2,000 miles away from home; (2) SUWS is not certified as a special education program nor are there any certified special education teachers at SUWS; (3) the SUWS program offers no academic services; and, (4) KidsPeace was an appropriate placement.

SUWS is "designed to be a powerful intervention for students that need structure, supportive counseling, motivational improvement, and the development of self-esteem, self-reliance, and self-respect." (R. at 69, 352). All students are expected to complete a rigorous course of experiential instruction that addresses Creative Writing, Healthy Living, Psychology,[15] Physical Education, Social Studies, Outdoor Leadership, English, Environmental Studies, First Aid, Personal Development, and Home Economics. (R. at 69, 352). Students are under twenty-four-hour supervision. (R. at 352). The program involved being with a group of six or seven students in the wilderness. (R. at 718). By the end of the program, N.S. was assuming a leadership role. (R. at 718).

The Hearing Officer found that SUWS was an appropriate alternative placement for N.S.:

SUWS clearly provided the structure and incentives to successfully address the major impediment that was preventing [N.S.] from making academic progress—his school non-attendance. There was some suggestion by the Department that [N.S.'s] school attendance issues, and his other emotional issues as well, were home based and were not issues

---

**15.** In the Psychology course,

Students learn fundamental principles of psychology by experiencing real-life situations that demand integrity, honesty, and responsibility. Students learn how their behaviors affect others, honest communication with friends and authority figures, and healthier functioning within their own families. Confronting their own beliefs and feelings, they can evaluate the effectiveness of patterns and choose more effective strategies.

(R. at 353).

that were within the school's sphere of responsibility. However, [N.S.'s] poor attendance record appears to have a clear connection to his emotional disability and "combined with ineffective programming . . . cannot be separated from [that handicapping condition]." . . . .

The Department further argues that the SUWS program is not the LRE for [N.S.]. However, while the restrictiveness of a placement may be considered when determining whether to award reimbursement, "parents are not held as strictly to the standard of LRE as are school districts." . . . . Placement at the SUWS of the Carolinas program did not violate the LRE requirement since, at the time of placement, the Lamoine School Department was unable to locate a placement either less restrictive and/or closer to home.

(R. at 75).

Further, the SUWS program was uniquely suitable for N.S. It removed him from his mother's oversight and placed him with other adolescents with similar concerns. It focused on emotional growth, physical activity, and encouraged his artistic and creative impulses. It was designed to instill confidence and responsibility.

The record is replete with evidence that the services provided by Lamoine were not successful. N.S.'s educational and non-educational problems were so intertwined they could not be separated. N.S.'s history in the public school system before his placement at SUWS was marked by massive difficulty with school attendance, which affected his academic progress. In the face of N.S.'s decline, Lamoine offered no plan to deal with his worsening condition, in spite of clinical recommendations that N.S. be placed in a residential setting. Although SUWS was not certified as a special education program and did not have certified special education teachers,

reimbursement is not barred because a private school is not readily identifiable as a special education placement and fails to meet the standards of the state educational agency. *See Carter*, 510 U.S. at 13–14, 114 S.Ct. 361; *Rafferty*, 315 F.3d at 26. Here, there is record support that SUWS, at a minimum, provided some element of services in which the public school placement was deficient. *Cf. Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523 (6th Cir.2003).

The cost of the SUWS program gives this Court considerable pause. There are presumably countless specialized (and expensive) programs scattered throughout this country that could benefit students like N.S. As Lamoine points out, the First Circuit has reminded us that "[a]ppropriateness and adequacy are terms of moderation," and the IDEA does not "promise perfect solutions." *Lenn*, 998 F.2d at 1086. This Court views the Hearing Officer's decision to order reimbursement of the considerable expense of the SUWS program in light of the absence of any proposed alternative by Lamoine during the period of N.S.'s attendance at SUWS.

Based on N.S.'s non-attendance, Lamoine's failure to respond, and N.S.'s mental health providers' recommendations, the Hearing Officer properly found that placement at SUWS was necessary for N.S.'s academic progress. Because tuition reimbursement is available only for an appropriate private school placement, and the Hearing Officer made the supportable finding that SUWS was appropriate, this Court affirms the Hearing Officer's decision ordering Lamoine to reimburse Ms. Z. for the cost of N.S.'s tuition at SUWS.

**E. Adequacy and Appropriateness of IEP for the 2003–2004 School Year**

Lamoine also asserts the Hearing Officer erred in concluding the 2003–2004

IEP, which identified the KidsPeace day treatment program as a placement, was not reasonably calculated to provide N.S. educational benefit. Lamoine proffers that the KidsPeace day treatment program was an appropriate placement because it would have provided N.S. "with an extremely well structured, therapeutic placement, which in virtually all regards met the very same standards that the hearing officer had articulated for a beneficial program." (Pl.'s Br. at 26–27).

The June 12, 2003 IEP proposed full-time placement at the KidsPeace day treatment program and included academic and emotional goals. At this time, however, N.S. was attending Cedar Mountain, the KidsPeace day treatment program was not yet licensed, and no students were enrolled there. The Hearing Officer determined the KidsPeace placement was inappropriate, noting, "It is not difficult to understand a parent's hesitation to place a Student in a program that did not yet exist." (R. at 76).

The evidence supports the Hearing Officer's conclusion that the KidsPeace day treatment program was not an appropriate placement for N.S. in June—September 2003. The program was not yet in existence, and N.S.'s mental health providers agreed it would not be an appropriate placement for him. Dr. Hawkins and Mr. McCarthy were particularly concerned that removing N.S. from Cedar Mountain too early would trigger a relapse. Mr. McCarthy noted N.S. was beginning to take a leadership role at Cedar Mountain, was engaging socially, and taking responsibility for parts of his program and his daily life. He clearly did not recommend returning N.S. to his community and a community-based program at this time.

The evidence supports the Hearing Officer's determination that, because Lamoine failed to identify an appropriate and avail-able placement for N.S., the 2003–2004 IEP was not reasonably calculated to provide N.S. educational benefit in the least restrictive setting.

## F. Appropriateness of Cedar Mountain Placement

The Hearing Officer concluded Cedar Mountain was an appropriate placement only until Lamoine identifies and offers an appropriate and less restrictive non-residential program closer to N.S.'s home:

[N.S.] is not "cured." He still needs what Cedar Mountain seems to be offering him—a highly individualized program, significant structure, a small setting, small class sizes and the ability to work in his area of great love, visual arts. Those needs do not suggest that [N.S.] needs a therapeutic day treatment program, and I am not persuaded that he either needed such a program last March, or that he needs such a program today.

However, I am also not persuaded that [N.S.] needs to attend a boarding school 2000 miles away in order to make educational progress. As noted above, what he needs is a highly individualized, small, supportive, structured setting that will demand school attendance while providing the supports [N.S.] will need to work through his emotional issues and alleviate his previous school avoidance.

The Lamoine School Department has failed to identify such a setting. In the absence of such a proposed placement, [Ms. Z.'s] unilateral placement at Cedar Mountain is appropriate until such time that the Department identifies and offers an appropriate, less restrictive, day program in or around Hancock County.

(R. at 76–77).

With regard to reimbursement for Cedar Mountain, the Hearing Officer stated:

The second part of this issue concerns parental reimbursement for the cost of the Academy at Cedar Mountain. To answer this we must look towards the equities that are at work in the situation. The School Department failed to identify an appropriate, and available, placement for student upon his completion of the SUWS program. However, neither Student's mother, nor her consultant, Ms. Goldberg, looked into any less restrictive, and more local, educational placements. Ms. Goldberg indicated that the King George School in Vermont was on her short list of possible placements, but that Student chose the Academy at Cedar Mountain. While it is advisable to include Student in the decision making process, it appears that he was given complete authority to choose any one of the schools on this list, with no consideration given to distance and cost. While the tuition and room and board at the King George School might be similar to that at Cedar Mountain, it is certainly closer to Student's home and would reduce the time and cost of travel, while enabling Student's mother to have more involvement with the Student and his school. It is also the case that Student is not receiving any sort of therapeutic intervention at Cedar Mountain.

(R. at 77).

The Hearing Officer noted that in a "legal sense" Cedar Mountain is an appropriate placement because N.S. has made, and will probably continue to make, educational progress. However, she was not persuaded in an "equitable sense" that

> [N.S.] requires a residential setting in order to make educational progress.... [N]o consideration was given to possible non-residential settings, or to residential settings closer to home. Lastly, it is unlikely that [N.S.] no longer needs any sort of therapeutic intervention, yet he

is receiving none at Cedar Mountain. Nor is [N.S.'s] mother receiving any family therapeutic intervention.

(R. at 77–78).

The Hearing Officer determined Ms. Z. was "entitled to some level of reimbursement for the costs related to [N.S.'s] attendance at the Academy at Cedar Mountain from April 23, 2003 up to such time as the Department offers an appropriate placement that is less restrictive than Cedar Mountain." (R. at 78). However, she noted tuition reimbursement is an equitable remedy, and awarded reimbursement to Ms. Z. in an amount equivalent to the amount Lamoine would have spent for N.S.'s placement and services if he had attended the KidsPeace day treatment program from April 23, 2003, until the PET identifies and offers a less restrictive, appropriate educational setting. She also noted that, if Lamoine identifies and offers an appropriate day program in the area, and Ms. Z. chooses to keep N.S. at Cedar Mountain, Lamoine is no longer responsible for paying Cedar Mountain tuition.

This Court finds that a preponderance of the evidence shows Cedar Mountain was an appropriate placement for N.S. after completion of the SUWS program. Lamoine failed to identify and offer an appropriate placement for N.S. after this completion at SUWS. Academically and emotionally, N.S. is receiving an educational benefit from Cedar Mountain; N.S.'s performance at Cedar Mountain has proven the experts' predictions essentially correct. This Court accepts the Hearing Officer's finding that Cedar Mountain is an appropriate placement for N.S. until Lamoine identifies an appropriate and less restrictive day program closer to N.S.'s home.

## G. Ms. Goldberg's Services

 Lamoine asserts the Hearing Officer erred in ordering it to reimburse

Ms. Z. for the costs associated with hiring Ms. Goldberg. Although both parties cite 34 C.F.R. § 300.403(c), which authorizes reimbursement for the cost of enrollment in a private school, neither party cites any case law directly on point, and this Court could find none. In *Connors v. Mills*, 34 F.Supp.2d 795 (N.D.N.Y.1998), the district court denied a parent's request for reimbursement of an educational consultant's fees pursuant to the IDEA's attorney fee provision, but suggested the educational consultant could collect her fees for evaluating and advising the parent about educational problems and the proper educational placement for the student. *Connors*, 34 F.Supp.2d at 808. Here, unlike *Connors*, the educational consultant did not attempt to collect her fees; rather Ms. Z. sought reimbursement for the fees paid to Ms. Goldberg. Under the *Connors* rationale, however, this Court concludes Ms. Goldberg's fees are reimbursable under 34 C.F.R. § 300.403(c) as a cost of enrollment, particularly in view of this Court's conclusion that the PET had effectively assigned this responsibility to Ms. Z.

## H. Notice Requirement

Lamoine finally contends Ms. Z. failed to comply with the specific notice requirements set forth in the IDEA, and therefore, reimbursement should be denied.

Reimbursement may be denied or reduced if parents do not give the district notice of their intent to remove their child from public school before they do so. 20 U.S.C. § 1412(a)(10)(C)(iii)(I); *see Rafferty*, 315 F.3d at 27. That notice can be provided either "at the most recent IEP meeting that the parents attended prior to

removal of the child from the public school" or by written notice ten business days prior to such removal. 20 U.S.C. § 1412(a)(10)(C)(iii)(I); *Greenland Sch. Dist. v. Amy N.*, 358 F.3d 150, 160 (1st Cir.2004).

These statutory provisions make clear Congress's intent that before parents place their child in private school, they must at least give notice to the school that special education is at issue. *Amy N.*, 358 F.3d at 160. "This serves the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a free appropriate public education can be provided in the public schools." *Id.*

■ This Court cannot accept Lamoine's argument that Ms. Z. violated the notice provision of the IDEA when placing N.S. at SUWS.[16] The January 17, 2003, PET minutes confirm there was a discussion about "possible residential situations." (R. at 131). In fact, Ms. Z. testified it was the PET itself that gave the names of residential treatment facilities to investigate. (R. at 435–36). Further, there is no indication in the PET minutes of February 27, 2003, that the PET was unaware Ms. Z. had been exploring alternative placements; to the contrary, the meeting had been scheduled in part to discuss the results of Ms. Z.'s investigation. (R. at 125–28). It may be true the PET was unaware of the specific placement at SUWS; however, once the PET had turned the process over to Ms. Z., it was on notice she would act. In fact, the very next meeting, Mr. White gave Ms. Z. his personal "Parent of the Year Award" for doing so. (R. at 116).

As to the placement at Cedar Mountain, this Court also concludes the notice provi-

---

**16.** This Court has already expressed its discomfort with Ms. Z.'s failure to keep Lamoine apprised of her independent efforts to locate an appropriate residential treatment alternative. The question is whether in doing so she violated the notice requirements of 20 U.S.C. § 1412(a)(10)(C)(iii)(I) and 34 C.F.R. § 300.403(d).

sions were not violated. At the March 31, 2003, PET meeting, Ms. Z. refused to consider the KidsPeace day treatment program and stated that SUWS would make a recommendation for a therapeutic boarding school for N.S. At that time, she informed the PET that N.S. would likely not be returning to Lamoine after completion of the SUWS program and that he was in an assessment program to help find the school. The placement at Cedar Mountain occurred on April 23, 2003. Lamoine clearly had notice of Ms. Z.'s intent to place N.S. at an out-of-state boarding school.

## I. Attorney Fees

In her cross-appeal, Ms. Z. requests attorney fees incurred by the Due Process Hearing and the defense of the lawsuit in this Court. The IDEA vests a court with discretion to grant reasonable attorney fees to the parents of a child with a disability if they may properly be characterized as "the prevailing party." 20 U.S.C. § 1415(i)(3)(B). Given that Ms. Z. has prevailed on her IDEA claim regarding N.S.'s placement, this Court grants Ms. Z. reasonable attorney fees.

## IV. CONCLUSION

The Plaintiff's appeal is hereby DENIED, and judgment is hereby entered in favor of the Defendant. The Defendant's request for attorney fees as the prevailing party is GRANTED. The Defendant has fourteen (14) days from the entry of this Order in which to submit an affidavit detailing reasonable attorney fees and costs, and the Plaintiff has fourteen (14) days in which to object to the Defendant's submission.

SO ORDERED.